# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MESO SCALE DIAGNOSTICS, LLC, | ) | |
| MESO SCALE TECHNOLOGIES, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 5589-VCP |
| | ) | |
| ROCHE DIAGNOSTICS GMBH, | ) | |
| ROCHE DIAGNOSTICS CORP., | ) | |
| ROCHE HOLDING LTD., | ) | |
| IGEN INTERNATIONAL, INC., | ) | |
| IGEN LS LLC, | ) | |
| LILLI ACQUISITION CORP., | ) | |
| BIOVERIS CORP., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Submitted: November 8, 2013
Decided: June 25, 2014

Collins J. Seitz, Jr., Esq., David E. Ross, Esq., SEITZ ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Mark C. Hansen, Esq., Michael J. Guzman, Esq., Joseph S. Hall, Esq., Gregory G. Rapawy, Esq., Christopher C. Funk, Esq., Joseph A. Bingham, Esq., KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C., Washington, D.C.; *Attorneys for Plaintiffs.*

Joel E. Friedlander, Esq., FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; Nancy J. Sennett, Esq., Paul Bargren, Esq., Brett H. Ludwig, Esq., Eric L. Maassen, Esq., FOLEY & LARDNER LLP, Milwaukee, Wisconsin; *Attorneys for Defendants.*

**PARSONS, Vice Chancellor.**

This action arises from the alleged breach of a license agreement pertaining to sophisticated diagnostic and assay technology. In 2003, a foreign pharmaceutical and diagnostic holding company lost or was in danger of losing its license to that technology. The holding company, therefore, sought to acquire a new license from the then-patent holder. In 2003, the holding company entered into a series of contemporaneously executed agreements that granted it a new non-exclusive license from the patent holder. The plaintiffs, two Delaware limited liability companies with disputed springing rights to the same patented technology, consented to the second non-exclusive license and "joined in" the licenses granted thereunder. As part of that transaction, the holding company acquired the patent holder, but not before its intellectual property assets were transferred to a separate company. In 2007, the holding company also acquired that separate company.

The plaintiffs allege that, since at least 2007, the defendants have disregarded repeatedly and deliberately the field-of-use restrictions prescribed in the 2003 license agreement. The plaintiffs aver that, by consenting to and "joining in" the licenses granted in the license agreement, they became parties to that agreement with the corresponding right to enforce the agreement's field-of-use limitations. As such, the plaintiffs assert that they are entitled to both an award of monetary damages, perhaps as much as several hundred million dollars, for the defendants' breaches of the license agreement since 2007 and an order of specific performance requiring the defendants to honor the 2003 agreement's field-of-use constraints for so long as the agreement remains valid.

1

In response, the defendants deny that the plaintiffs became parties to the license agreement by virtue of the "join in" language. According to the defendants, they neither needed nor received a license from the plaintiffs. Thus, the defendants argue that they do not owe the plaintiffs any contractual duties under the 2003 license agreement and that the plaintiffs lack standing to assert claims for breach of that agreement.

This Memorandum Opinion constitutes my post-trial findings of fact and conclusions of law on the plaintiffs' claim for breach of contract. For the reasons that follow, I conclude that the plaintiffs have failed to establish that they are parties to the license agreement or that they otherwise have standing to enforce the agreement's field-of-use restrictions. Because the plaintiffs are not parties to the license agreement and cannot enforce it, they have failed to prove that the defendants owed them a contractual duty under that agreement. Therefore, I find in favor of the defendants and dismiss the plaintiffs' claim for breach of contract with prejudice.

## I.    BACKGROUND

### A.    The Parties

The plaintiffs, Meso Scale Diagnostics, LLC ("MSD") and Meso Scale Technologies, LLC ("MST" and, collectively, "Plaintiffs" or "Meso") are Delaware limited liability companies. MST was founded by Jacob Wohlstadter ("Wohlstadter") to commercialize his invention of a new application of electrochemiluminescence ("ECL") technology. In 1995, MST and IGEN International, Inc. ("IGEN") formed MSD as a joint venture. The joint venture was created to research and develop the use of various

2

technologies in diagnostic procedures, including procedures utilizing ECL technology. Wohlstadter is the President and Chief Executive Officer ("CEO") of MSD and MST.

The defendants in this case (collectively, "Defendants") are identified below and are all affiliates or subsidiaries of the F. Hoffmann–La Roche, Ltd. family of pharmaceutical and diagnostics companies. Roche Holding Ltd. ("Roche") is a publicly traded joint stock company organized under the laws of Switzerland. Roche Diagnostics GmbH is a limited liability company organized under the laws of Germany and a wholly owned subsidiary of Roche. Roche Diagnostics Corp., which is incorporated in Indiana, is also a wholly owned subsidiary of Roche. IGEN is a Delaware corporation that was acquired by Roche in 2003 and remains a wholly owned subsidiary of Roche. IGEN LS, LLC ("IGEN LS") is a Delaware limited liability company and wholly owned subsidiary of IGEN. BioVeris Corp. ("BioVeris") is a Delaware corporation and wholly owned subsidiary of Roche. BioVeris owns and licenses a portfolio of patents based on and related to ECL technology. Lili Acquisition Corp. ("Lili Acquisition") was a subsidiary of Roche; it was merged into BioVeris on June 26, 2007, and no longer exists.

### B.      Facts

#### 1.      The 1992 and 1995 Licenses

In 1992, IGEN granted an exclusive license to Boehringer Mannheim GmbH ("Boehringer") to use ECL technology for diagnostic testing at hospitals, blood banks, and clinical reference laboratories (the "1992 License").[1] Boehringer also agreed in the

---

[1]      JTX 6 § 1.4.

3

1992 License not to "advertise, market, sell or otherwise commercially exploit" ECL technology outside of those specified areas.[2]

In 1995, IGEN and MST formed MSD as a joint venture. Arguably, IGEN's most significant contribution to the joint venture was granting MSD an exclusive license to practice ECL technology in certain areas (the "1995 License"). Specifically, MSD received an exclusive license "to practice [ECL technology] to make, use and sell products or processes (A) developed in the course of the Research Program, or (B) utilizing or related to the Research Technologies."[3] IGEN, however, was not required "to grant MSD a license to any technology that is subject to exclusive licenses to third parties granted prior to the date" of the 1995 License. This apparently included the technology licensed to Boehringer in the 1992 License. The 1995 License also contained a "springing rights" provision. The provision states that, if any preexisting exclusive license "terminates, or IGEN is otherwise no longer restricted by such license from

---

[2] *Id.* § 4.7.

[3] JTX 10 § 2.1. As defined in a 2001 amendment to the joint venture agreement between IGEN and MST, the Research Technologies encompassed: (1) selection and screening methods; (2) disposable electrodes; and (3) multi-array diagnostics. JTX 48 § 1.11 at MESO00053172-73. They also included other technologies such as "agents to extend the electric potential of an electrode in the direction perpendicular to its surface." *Id.* at MESO00053173. The Research Program was "initially [to] be directed" at the use of those same technologies in diagnostic procedures. *Id.* Ex. A at MESO00053220. The definitions of "Research Program" and "Research Technologies" were redacted in IGEN's public filings such that it was not possible to discern the scope of MSD's ECL rights from publicly available information.

licensing such technology to MSD, such technology shall be, and hereby is, licensed to MSD pursuant hereto."[4]

## 2. IGEN sues Boehringer

In 1997, IGEN sued Boehringer for numerous breaches of the 1992 License, including the sale of products outside of the agreement's designated markets.[5]  Shortly thereafter, Roche acquired Boehringer, took over the defense of the IGEN lawsuit, and began its efforts to negotiate a non-judicial resolution to the dispute.

For several years, Roche and IGEN engaged in fruitless settlement discussions.  In December 2001, Roche made an offer to resolve the two sides' disagreement by acquiring IGEN for $1.5 billion.[6]  Roche's offer was contingent on due diligence, which "quickly identified the relationship between IGEN and MSD as a roadblock to the intended acquisition."[7]  Although Roche's due diligence team was able to "to obtain an unedited version" of the "voluminous and convoluted contracts" that defined the relationship between IGEN and Meso, the diligence team's analysis was "complicated by the fact that neither IGEN nor MSD/MST legal counsel nor operations personnel appeared forthcoming or willing to discuss" those agreements.[8]  Nevertheless, the team

---

[4]     JTX 10 § 2.1

[5]     JTX 15.

[6]     JTX 62.

[7]     *Id.* at ROCHE0036626.

[8]     *Id.*

concluded that if Roche acquired IGEN, as it was, that acquisition "would *not* achieve the stated objectives of unencumbered ownership [of certain ECL technology], avoidance of future litigation and discontinuation of business relationships with business entities controlled by the Wohlstadter family."[9] Consequently, in late-December 2001, Roche informed IGEN that it would "not pursue an acquisition unless IGEN/MSD/MST would first redefine the nature of their relationship substantially."[10]

IGEN and Roche were continuing to negotiate when, on January 10, 2002, IGEN prevailed at trial against Roche on, among other things, its claim that Roche had breached the terms of the 1992 License.[11] A jury awarded IGEN damages in excess of $500 million and the district court ruled that, based on Roche's breaches of the 1992 License, IGEN could terminate that agreement.[12]

### 3. Roche decides to pursue a new license from IGEN

Notwithstanding the verdict against Roche, IGEN and Roche continued to discuss the possibility of settling their dispute by having Roche acquire IGEN. On May 3, 2002, however, Roche advised IGEN that it was no longer interested in pursuing an acquisition.[13] Its reason for the change in objective was twofold. First, for Roche to

---

[9] *Id.*

[10] *Id.* at ROCHE0036627.

[11] *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 308 (4th Cir. 2003).

[12] *Id.*

[13] JTX 71.

become comfortable with acquiring IGEN, there would need to be a "major modification" of the relationship between IGEN and Meso. Roche believed that Meso's demand for compensation to effectuate such a modification was "likely to be substantial," and there was "not enough value in the business" to warrant a purchase price that likely would be acceptable to both IGEN and Meso.[14] Second, Roche expressed concern that any payment to Meso would be perceived by certain IGEN shareholders as payment "behind their back," designed to divert value away from them, which, in turn, could lead those shareholders to attempt to enjoin the transaction or refuse to tender their shares. Roche proposed that the best path forward for both sides was to agree to a non-exclusive license because Roche was "the best possible licensee of IGEN."[15]

About a month later, in June 2002, Roche and IGEN participated in a court-ordered mediation of their dispute. Consistent with Roche's May 2002 letter, Roche proposed that IGEN grant it a non-exclusive license "to the ECL Technology which is the subject of the [1992 License]."[16] The proposal also included a list of some of the "material elements" of such a license, including that "[Meso] would consent to and join in the license granted to Roche as necessary to insure Roche's non-exclusive use of the

---

[14]     *Id.*

[15]     *Id.*

[16]     JTX 73 at BV0003206.

7

ECL Technology in Roche's field."[17]   Another "material element" was that improvements to the ECL Technology previously made by Roche and conveyed to IGEN could be used by IGEN only in "fields of use other than the Field licensed to Roche."[18]

### 4. Roche and IGEN begin to exchange draft license agreements

On July 22, 2002, IGEN circulated a draft license agreement to Roche. This appears to be the first draft of an agreement that was shared among both sides. IGEN's proposal included a defined "Field" in which Roche would be allowed to utilize ECL technology. The draft made no reference to Meso.[19]

On August 1, 2002, Roche proposed its own draft of a license agreement to IGEN. Roche's draft called for IGEN and its "Affiliates" to grant Roche a license to use ECL technology within a defined field.[20] The definition of the term "Affiliates" explicitly included Meso.[21] Roche also included an attached page entitled "Consent by IGEN Affiliates." The proposed consent provided that Meso would "consent to and join in the

---

[17]   *Id.* at BV0003207.  I previously concluded that the phrase "join in the licenses granted" in the pivotal 2003 License Agreement is ambiguous. *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 93 (Del. Ch. 2013). Therefore, I recite below some of the relevant extrinsic evidence pertaining to that agreement.

[18]   *Id.*

[19]   JTX 76.

[20]   JTX 78 § 2.2.

[21]   *Id.* at ROCHE0053800.

8

licenses granted" in the agreement.[22] In addition, Roche's draft contemplated that Meso would represent and warrant that it did not have "any right, title, and interest in the Licensed ECL Technology licensed to Roche" in the proposed agreement "that would in any way restrict or limit Roche's exercise of the licenses [being] granted."[23] Less than two weeks later, Franz Humer, the Chairman of Roche, wrote to Samuel Wohlstadter, Chairman and CEO of IGEN and Wohlstadter's father, to reemphasize Roche's position in the ongoing settlement discussions. Humer wrote in part that "[a]ny settlement has to achieve for Roche complete freedom of operation in our field, including complete protection from the 'Meso' companies. Roche will not negotiate with Meso and I consider it your responsibility to deliver the necessary consents and covenants from Meso."[24]

On October 9, 2002, IGEN granted certain Roche employees access to unredacted versions of its agreements with Meso.[25] Roche's outside counsel had been in possession of those documents for a "few weeks" before IGEN authorized anyone employed by Roche to review them.[26]

---

[22]    *Id.* at ROCHE0053799.

[23]    *Id.*

[24]    JTX 81 at ROCHE0057409.

[25]    JTX 86.

[26]    *Id.* On August 20, 2002, outside counsel for Roche indicated in an email to Bill Perlstein, an IGEN employee, that Meso's "exclusive rights in the ECL Technology appeared to encompass all of Roche's rights under the 1992 License

9

On November 6, 2002, IGEN circulated an updated draft of the license agreement to Roche. In this version, IGEN removed the Meso "consent" and also amended the definition of "Affiliate" such that "[MSD] . . . shall not be deemed an Affiliate of [IGEN] for purposes of this Agreement unless [IGEN] elects by written notice to [Roche] to include such company as an [IGEN] Affiliate."[27] IGEN also removed all references to "Affiliates" from the draft agreement's grant clause.[28]

On November 22, 2002, Roche sent IGEN its next proposal for how the license agreement should be structured. In it, Roche reinserted: (1) MSD and MST into the definition of Affiliates; (2) the term "Affiliates" into the agreement's grant clause; (3) and the Meso consent, which, as in previous drafts, appeared after the Roche and IGEN signature blocks, but before the agreement's exhibits.[29] The consent also contained a new footnote stating that "Roche is considering whether a formal license of ECL Technology from MSD/MST to [Roche] may be necessary to assure [Roche's] access to all ECL Technology. This issue is subject to further due diligence by Roche."[30]

---

Agreement once that Agreement was terminated or became non-exclusive." JTX 82.

[27] JTX 101 at ROCHE0032572.

[28] *See id.* at ROCHE0032575 ("[IGEN] hereby grants to [Roche], only for use in the Field, a Non-Exclusive, worldwide, fully-paid, royalty-free right and license under the Licensed ECL Technology").

[29] JTX 104 at CSM0033021, 33026, and 33040.

[30] *Id.* at CSM0033040.

On January 17, 2003, IGEN's counsel circulated a marked-up draft agreement to Roche's counsel. The marked changes had "not been accepted by either party," but, instead, were "merely intended to memorialize what [was] discussed during [a] conference call" held earlier that day.[31] The mark-up of the grant clause, Section 2.1 of the agreement, read "IGEN OBJECTS TO 'and its Affiliates'[32]: Roche is concerned (1) that there are springing exclusive rights in Meso that would preclude granting all of these non-exclusive rights to Roche; and (2) that IGEN has not granted rights to its Affiliates which would prevent IGEN from granting these licenses."[33] IGEN's mark-up did not comment regarding Roche's first listed concern, but it stated that "IGEN believes (2) can be resolved through due diligence."[34]

### 5. Roche and IGEN continue to negotiate; MSD signs a confidentiality agreement

On April 29, 2003, Roche and MSD executed a formal confidentiality agreement.[35] Immediately thereafter, Roche and IGEN began including Meso's outside counsel on emails circulating draft license agreements.[36]

---

[31] JTX 118 at ROCHE0038187.

[32] In other words, IGEN objected to the proposed language that IGEN and its "Affiliates" would be granting licenses under the agreement.

[33] JTX 118 at ROCHE0038195.

[34] *Id.*

[35] JTX 144. In November 2002, IGEN sent MSD a "confidentiality agreement for signature by MSD, IGEN and Roche to be executed in connection with providing to MSD a copy of the draft documents sent to Roche by IGEN." JTX 102. It is unclear whether any of IGEN, MSD, or Roche executed this document. At a

11

Meso argues that before the execution of the confidentiality agreement, Wohlstadter represented Meso in negotiating directly with Roche and IGEN. The record, however, does not support this assertion. In addition to his roles at Meso, Wohlstadter also served as a consultant to IGEN.[37] There was credible testimony that, during the early negotiations between Roche and IGEN, Wohlstadter's presence and participation in various meetings was in his role as a consultant to IGEN.[38] In addition, IGEN's General Counsel, on numerous occasions, indicated specifically that he was, pre-April 2003, forwarding documents and drafts to Wohlstadter related to IGEN's negotiations with Roche, "solely in his capacity as a consultant to IGEN."[39] I also note that, on December 2, 2002, the Joint Venture Operating Committee ("JVOC") of MSD met to discuss IGEN's negotiations with Roche and the "effect [] the proposed transaction with Roche

---

minimum, the record indicates that Roche was neither aware of, nor party to, this particular confidentiality agreement.

[36] JTX 146.

[37] JTX 46.

[38] *See* Tr. 581–82 (Steinmetz) ("Q: And did anybody ever give you any indication as to whether Jacob Wohlstadter was participating with his MSD hat on or with an IGEN hat on? A: Yes. Q: Who did and what was the indication you were given? A: Our understanding was that Jacob was acting on behalf of IGEN . . . Sam Wohlstadter . . . sa[id] that Jacob was acting as a consultant to IGEN, which made sense to us in a way"); Tr. 753–55 (Keller) ("Q: What did you understand to be [Jacob Wohlstadter's] role when he was present? A: Well, he was clearly introduced to us as an agent or consultant of IGEN. We knew, of course, he is Meso, I don't know chairman or president, but for us, he was sitting there as a member of the IGEN team.").

[39] *See* JTX 106, 108, 109, 110, 111, 113.

would have upon [MSD]."[40] In response to a question from IGEN's management "as to what role, if any, the [JVOC] envisioned for Jacob Wohlstadter in the negotiations with Roche scheduled to begin the following day," after "considerable discussion," the JVOC "concluded that Jacob's role in the negotiations should be limited to technical advice only and that it was not appropriate for Jacob to be a party to [IGEN's] negotiation strategy."[41]

As of April 29, MSD and MST still were defined explicitly as "Affiliates" of IGEN and the Meso consent from the November 22, 2002 draft agreement remained largely unchanged.[42] IGEN considered this draft consent "acceptable," but noted that it was subject to "discussion with MSD and MST" after they completed a confidentiality agreement with Roche.[43]

On May 2, 2003, Kenneth Slade, outside counsel for IGEN,[44] distributed an updated draft of the license agreement purporting to reflect changes based on discussions

---

[40] JTX 115.

[41] *Id.* Thus, to the extent Wohlstadter forwarded drafts and documents to Meso's outside counsel to review before Meso and Roche reached a confidentiality agreement, I find that Roche (and probably IGEN as well) neither knew about, nor authorized, that conduct.

[42] JTX 147 at FL032452.

[43] *Id.*

[44] Throughout the negotiations between Roche and IGEN, Slade consolidated the two sides' comments and circulated updated drafts of the license agreement. After MSD executed the confidentiality agreement, Meso submitted its comments on drafts, along with IGEN's comments, through Slade. Thus, the trial record indicates that Roche and Meso did not negotiate directly with one another before the ultimate license agreement between Roche and IGEN was finalized in July 2003.

held earlier that day between IGEN, presumably with input from Meso, and Roche. In this draft, MSD and MST were excluded specifically from the definition of an IGEN "Affiliate." Additionally, the definition of "Licensed ECL Technology" was amended to specify that IGEN either owned, or had the right to sublicense, the underlying technology at issue.[45] As to the Meso consent associated with this version of the agreement, Meso asked that the "join in" language and Meso's representation that they had no rights in the Licensed ECL Technology be removed.[46]

On May 8, 2003, Slade circulated the next draft of the agreement. In this updated version, Roche reinserted the "join in" language and suggested a modified version of the "no rights" clause that had been included in the April 29 version. Specifically, Roche proposed that MSD and MST "represent and warrant to [Roche] that they have no right . . . to in any way restrict or limit [Roche's] exercise of the license granted in the License Agreement."[47]

On May 30, 2003, IGEN circulated a draft of the agreement and corresponding comments internally and to Meso. Of particular relevance are Section 9.6 and the attached consent. Regarding Section 9.6, the draft stated:

> ROCHE MAY 20 PROPOSAL: and (iv) no consent, notice, approval, authorization, waiver or permit, to or from any person [MSD: excluding any consents attached hereto],

---

[45]     JTX 156 § 1.8.

[46]     *Id.* at FL0032616.

[47]     JTX 163 at MESO00000802.

including, but not limited to, any Governmental Entity or third party holder of intellectual property rights is required to be obtained or made by IGEN in connection with its execution and delivery of this Agreement [MSD: delete remainder] or the consummation of the transactions contemplated hereby.[48]

At this time, the consent still included both the "join in" language and Roche's request that Meso represent and warrant that it had "no rights" that could interfere with Roche's exercise of the license being granted in the License Agreement.[49]

On June 3, 2003, Slade distributed the most updated version of the agreement to Roche, IGEN, and Meso. By this date, Roche's proposed language in Section 9.6(iv) had been modified to read:

> (iv) no consent, notice, approval, authorization, waiver or permit, to or from any person (other than the consent attached hereto), including, but not limited to, any Governmental Entity or third party holder of intellectual property rights is required to be obtained or made by IGEN in connection with its execution, delivery and performance of this Agreement.[50]

The Meso consent in the draft circulated on June 3 included the "join in" language, but, at Meso's insistence, did not include the "no rights" representation and warranty that Roche previously had sought.[51] After the June 3 draft, the substance of the Meso consent remained the same.

---

[48]    JTX 182 § 9.6.

[49]    *Id.* at MESO00009447.

[50]    JTX 183 § 9.6.

[51]    *Id.* at MESO00059891.

15

### 6. IGEN's right to terminate the 1992 License is upheld; Meso seeks compensation for the first time

During the course of negotiations regarding the License Agreement, on July 9, 2003, the United States Court of Appeals for the Fourth Circuit decided Roche's appeal of the January 2002 verdict against it.[52] In its decision, the Fourth Circuit reduced the compensatory damages award and vacated the punitive damages award that the trial court had entered against Roche. The Fourth Circuit, however, upheld IGEN's right to terminate the 1992 License. That same day, IGEN's General Counsel, Daniel Abdun-Nabi, sent written notice to Roche that IGEN was terminating the 1992 License.[53]

On July 15, 2003, Humer sent a letter to the Roche board to update them on the status of the ongoing negotiations with IGEN. Humer noted that, although the Fourth Circuit upheld IGEN's right to terminate the 1992 License, it was in both Roche's and IGEN's interests to agree to a new license, and that the two sides were "as close as they have ever been to a successful conclusion."[54] According to Humer, the two sides had reached agreement on a "deal structure" that would allow Roche to achieve several "objectives" including "[f]ull unhindered access to ECL technology" and "[c]onsent and agreement of 'Mesoscale Diagnostics', an associated company of IGEN owned by [Samuel] Wohlstadter's son to all agreements between Roche and IGEN."[55] Humer

---

[52]    *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303 (4th Cir. 2003).

[53]    JTX 198.

[54]    JTX 206 at ROCHE0022446.

[55]    *Id.* at ROCHE0022447.

described this "consent and agreement" as "necessary" because "Mesoscale could block the deal based on a complicated set of internal agreements between IGEN and Mesoscale."[56] Nowhere in the letter, however, does Humer suggest that Roche had sought or obtained a license from Meso. He further stated that he expected "to be able to sign final documents and agree on the price [of the transaction with IGEN] by the weekend of July 20."[57]

Also on July 15, Wohlstadter, for the first time, requested compensation for Meso's role in the 2003 transaction.[58] The following day, he sent a memo, prepared with

---

[56]  *Id.* Meso's "blocking power" stemmed largely from its ability to preclude IGEN from transferring its ownership interest in MSD to a new company that was being formed as part of the 2003 transaction (*i.e.*, BioVeris). IGEN's former CFO, George Migausky, testified that "the deal structure was such that Roche would acquire -- acquire IGEN. Simultaneously, IGEN -- well, IGEN previously would have dropped certain assets that Roche was not interested in acquiring, would drop certain assets into a sub, and that sub, BioVeris, would be spun out to the shareholders. . . . And for those assets being spun out to one of which was our joint venture interests in MSD, together with a number of other interests, other licenses and multiple other agreements, actually, in many cases, we needed to get consents." Migausky Dep. 64. The deal was structured this way to avoid "several hundred million dollars" of "tax leakage" that would have been borne by IGEN's shareholders. *Id.* at 64–65. According to Migausky, this gave MSD "holdup value" because "[t]he way we had the deal structured, we needed -- we, IGEN that is, needed MSD's consent, and so they could potentially block the transaction, unless they gave -- unless they gave consent, and could require, in this case, payment if -- in order to accommodate them." *Id.* at 69–70.

[57]  JTX 206 at ROCHE0022446.

[58]  JTX 205.

17

the assistance of Meso's outside counsel Robert Waldman,[59] to the JVOC outlining the reasons he believed Meso was entitled to some payment in exchange for its participation in the deal between IGEN and Roche. In the introduction of the memo, Wohlstadter wrote "[a]s a result of being required to *consent to* the I[GEN]/R[oche] transaction, to *join in* the license from NEWCO to Roche, and to *become a party to various agreements* (such as the Covenant Not to Sue and releases), MSD believes it will suffer substantial diminution in rights, prospects and value."[60] The memo also describes, using specific examples, how the 2003 transaction would be detrimental to MSD. Yet, at no point in the memo does Wohlstadter indicate that Meso is granting Roche a license or that Meso had acquired any "springing rights" by virtue of IGEN's purported termination of the 1992 License Agreement. In contrast, the memo states at least six times that IGEN or BioVeris would be granting rights to Roche in the deal being contemplated.[61] One such reference to licensing by IGEN appears in the following example of potential detriment to MSD:

> As a result of the 4th Circuit decision, IGEN terminated the 1992 license agreement between IGEN and Roche, and by granting the new license to Roche, IGEN is reinstating Roche into the largest IVD [in-vitro diagnostic] market (large laboratories). If IGEN did not grant the license to Roche,

---

[59] *See* Tr. 367 (Waldman) ("Q: You helped draft [the July 16, 2003 memo], and you were involved in preparing it? A: Yes, I believe so.").

[60] JTX 210 at MESO00053070 (emphasis added).

[61] *Id.* ¶¶ 1, 2, 5, 6.

18

MSD would not have the world's largest bio/pharma company as a direct competitor.[62]

Wohlstadter also recognized that, under the proposed license agreement, MSD would not be entitled to compensation if Roche breached the "out-of-field" provisions contained therein. He wrote:

> Through the "out-of-field" sales provisions of the proposed new license between [BioVeris] and Roche, in effect, IGEN is granting ROCHE the ability to sell products outside of the IVD market so long as Roche does not "know" that the use of the products is outside of IVD. If Roche makes any out-of-field sale, Roche's only consequence is to pay 65% of undisputed revenues earned the prior year and only after Roche has been informed by IGEN of the out-of-field sales. The license does not terminate for out-of-field sales. Therefore, Roche can sell with impunity outside the field, with the only penalty being a small "toll," which broadens Roche's ability to directly compete with MSD. In addition, MSD receives no compensation as a result of any such breaches by Roche.[63]

Three days later, on July 18, the JVOC responded to Wohlstadter. In its memo, the JVOC encouraged MSD to grant all of the "consents" that it was being asked to provide by Roche and IGEN as part of the 2003 transaction, and to do so "without any compensation."[64] To support its position, the JVOC listed five specific factors that weighed in favor of MSD executing the proposed consents, including:

---

[62] *Id.* ¶ 5.

[63] *Id.* ¶ 6.

[64] JTX 221 at MESO00006196.

If the Roche transaction is not completed, the scope of the rights granted to Roche under the proposed licensing arrangements is largely irrelevant, because, in light of the lack of success to date of your efforts to find funding (about which the JVOC has no comment), MSD will almost certainly cease to be a viable competitor in its field. Thus, MSD is not put in a worse position by granting the Consents. In addition, assuming (but not conceding) that Roche's rights under the new licensing arrangement are broader than the rights under the 1992 License, the JVOC believes that IGEN would be able to license these "broader" rights to other competitors of MSD without violating MSD's exclusive license to utilize the Research Technologies in the Diagnostic Field.[65]

Nowhere in the July 18 memo does the JVOC state that MSD or MST is granting Roche a license.[66]

On July 20, 2003, the JVOC sent another memo to Wohlstadter. This memo expressed frustration that Wohlstadter had "chosen to raise [his] points at the eleventh hour after leading the JVOC, IGEN, and Roche to believe for over five months that [he was] agreeable to the NEWCO structure, which would keep in place all prior

---

[65] *Id.* at MESO00006197.

[66] The JVOC's memo also notes that the proposed transaction "guarantees MSD's freedom to operate in its field in the future without interference from Roche." *Id*. Furthermore, the evidence shows that the "field" being referred to here is multi-array technology. For example, the July 18 memo was a response to Wohlstadter's July 16 memo in which he expressed concern that "the new license from NEWCO" would "introduce[] a great degree of ambiguity with respect to MSD's exclusivity in multi-array." JTX 210 ¶ 2. Additionally, Robert Salsmans, Chairman of the JVOC, testified credibly that the JVOC was referring to multi-array technology in the memo. *See* Tr. 1005 (Q: Okay. What field are you talking about here? A: Well, the -- the scope, the joint -- of the joint venture being, again, single electrodes, multi[-]array technology.).

understandings without change."[67]  The memo noted further that "the JVOC permitted [Wohlstadter] to assist IGEN in its negotiations with Roche," on the basis of his professed amenability to the proposed transaction between IGEN and Roche.[68] Notwithstanding their displeasure with Wohlstadter, the JVOC represented that IGEN and BioVeris would commit to providing MSD with $30 million in funding if Wohlstadter agreed to provide the requested consents.

The next day Wohlstadter responded with his final counteroffer.  In that letter, he asserted that, "MST has made enormous concessions in these negotiations, yielding to virtually all of [the JVOC's] demands," and demanded $37.5 million in exchange for his consents.[69]  Although the JVOC acquiesced to Wohlstadter's funding demand, that decision appears to have been motivated primarily by a desire to preserve the proposed $1.2 billion transaction between IGEN and Roche, and not by any belief that Wohlstadter

---

[67] JTX 225 at MESO00017399.  This was not the first time the JVOC encountered difficulty in dealing with Wohlstadter.  Salsmans testified, without challenge, that in the negotiations surrounding the 2001 amendment of the joint venture agreement between IGEN and MST, it was "extremely difficult to do business, to come to conclusions, to come to an agreement with Jacob Wohlstadter. . . . We would have discussions.  He would agree. . . . The next day you would receive -- or two days later you would receive a confirmation of that agreement, but that confirmation would be completely different from the things that we had agreed on."  Tr. 996–97.  Salsmans testified further that Wohlstadter's penchant for making "additional demands or new versions," "didn't happen one time."  Nor did that "happen twice, but that happened a lot of times and that happened not only in these discussions [in 2001] but it happened, also, in discussions that we had at a later stage in 2003 in the framework of the IGEN-Roche agreements."  *Id.* at 997.

[68] JTX 225 at MESO00017399.

[69] JTX 232 at MESO00007165-66.

21

was correct on the "merits." Moreover, IGEN only agreed to provide MSD with $30 million of funding. The remaining $7.5 million came via a personal investment from Wohlstadter's father, Samuel Wohlstadter.[70]

### 7.     The 2003 transaction

On July 21, 2003, the investment bank Lehman Brothers reviewed the proposed transaction between IGEN and Roche with IGEN's board and delivered a presentation "discuss[ing] methods of valuing the component parts of IGEN's business as well as the financial implications to IGEN shareholders of the proposed transaction."[71] At this time, MSD would have acquired whatever "springing rights" it might have sought to claim as a result of IGEN's July 9, 2003 notice that it was terminating the 1992 License. Nevertheless, for purposes of its analysis, Lehman Brothers did not ascribe any value to IGEN's stake in MSD.[72]

On July 24, 2003, IGEN's board held a special meeting to consider the proposed transaction "between [IGEN], on the one hand, and [Roche], on the other hand, whereby Roche would acquire [IGEN] and simultaneously [IGEN] would distribute to its stockholders shares of a new company ([BioVeris]) holding certain of [IGEN's] assets and liabilities."[73] The IGEN board was informed that the JVOC had succeeded in

---

[70]     JTX 261.

[71]     JTX 228 at BV0004315.

[72]     *Id.* at BV0004332.

[73]     JTX 249 at BV0054366.

22

"obtaining the consents of MSD and MST to the [p]roposed [t]ransaction." There was no discussion, however, about Meso participating in the transaction as a licensor.[74] After hearing presentations from their financial and legal advisors, the IGEN board voted unanimously to approve the transaction with Roche and to "adopt the resolutions subject to final confirmation by MST's counsel that it is satisfied with the documentation in connection with the [p]roposed [t]ransaction."[75]

Later that day, IGEN and Roche consummated their complex transaction, which was memorialized in approximately 145 documents.[76] MSD and MST were signatories to five of those documents.[77] As a result of the transaction, IGEN's shareholders received shares in BioVeris and over $1 billion in cash from Roche. In addition, IGEN agreed to provide MSD with $37.5 million in funding. None of the documents called for Roche to pay, nor did Roche pay, any compensation to MSD.

### 8.      The 2003 License Agreement

The document most relevant to this litigation is the license agreement that IGEN and Roche executed as part of the overall 2003 transaction (the "License Agreement" or "2003 License Agreement"). The License Agreement identifies two "Parties," IGEN and

---

[74]      *Id.*

[75]      *Id.* at BV0054369.

[76]      JTX 287.

[77]      These documents were: (1) the Global Consent and Agreement (JTX 258); (2) the Joinder to the Ongoing Litigation Agreement (JTX 257); (3) the Covenants Not to Sue (JTX 265); (4) a July 24, 2003 Letter Agreement (JTX 260); and (5) the Consent to the 2003 License Agreement (JTX 263).

Roche,[78] and defines the term "Affiliates" to exclude specifically MSD and MST.[79]

Section 2.1 of the agreement, entitled License Grant, states:

> During the term of this Agreement, and subject to the terms and conditions of this Agreement, IGEN and its Affiliates grant to [Roche], only for use in the Field, an irrevocable, perpetual, Non-Exclusive, worldwide, fully-paid, royalty-free right and license under the Licensed ECL Technology, to develop, have developed, prepare derivative works based on, reproduce, use, manufacture, have manufactured, distribute, have distributed, display, perform, modify, import, sell, offer for sale, have sold, lease and otherwise commercially exploit Products.[80]

The agreement defines "Licensed ECL Technology" as "ECL Patent Rights[81] and any and all proprietary or confidential or technical information relating to ECL Technology owned by IGEN or any of its Affiliates or licensed to IGEN or any of its Affiliates from a third party with the right to grant the licenses under Section 2.1 hereof."[82]

---

[78]  JTX 263 at ROCHE0055861. Technically, IGEN's counterparty was IGEN LS LLC, an entity formed for the purpose of effectuating the License Agreement. It is undisputed that, for purposes of Plaintiffs' claims, IGEN LS LLC and Roche may be used interchangeably.

[79]  *Id.*

[80]  *Id.* at ROCHE0055867.

[81]  This term essentially refers to a 27-page list of ECL-related patents owned or controlled by IGEN and its Affiliates attached as Exhibit A to the License Agreement. *Id.* at ROCHE0055890-917.

[82]  *Id.* at ROCHE0055866.

24

The term "Products" is defined to exclude expressly "Multi-Array" technologies, meaning that the License Agreement generally did not grant Roche any right to, for example, make or sell products of the multi-array kind produced by Meso.

In Section 2.6, Roche "covenant[ed] that it w[ould] not, under any circumstances, actively advertise or market the Products in fields other than those included in the Field."[83] As its General Counsel, Gottlieb Keller, acknowledged, Roche knew that the License Agreement did not sanction the intentional sale of Products outside of the Field.[84] Regarding unintentional or unknowing sales of Products outside of the Field, the License Agreement addressed that issue in two separate provisions. Section 2.5(a) provides for both sides (*i.e.*, Roche and IGEN) to agree annually on an independent third-party to monitor Roche's compliance with the License Agreement (the "Field Monitor").[85] Under Section 2.5(b), Roche undertook to pay IGEN 65% of all "undisputed revenues earned

---

[83]     *Id.* at ROCHE0055870. The "Field" is defined as "analyzing . . . specimens taken from a human body, including without limitation, blood, bodily fluid or tissue, for the purpose of testing, with respect to that human being, for a physiological or pathological state, a congenital abnormality, safety and compatibility of a treatment or to monitor therapeutic measures." *Id.* at ROCHE0055865.

[84]     *See, e.g.,* Tr. 780 (Keller) ("THE COURT: And was it your understanding that Roche had a license from BioVeris in the 2003 license to operate intentionally outside that field? THE WITNESS: No, definitely not intentionally."). This also is supported by the fact that the License Agreement required Roche to sell or place Products only with customers it "reasonably believed" would use the Products in the "Field." JTX 263 at ROCHE0055869.

[85]     JTX 263 at ROCHE0055869.

through out-of-Field sales of Products for the prior year" identified by the Field Monitor.[86] There is no mention of Meso in either Section 2.5(a) or (b).

Finally, the License Agreement also included a "Consent By Meso Scale Diagnostics, LLC. And Meso Scale Technologies LLC." In this document, located on a separate page after the Roche and IGEN signature blocks, MSD and MST "consent[ed] to the foregoing License Agreement dated as of July 24, 2003" and "consent[ed] to and join[ed] in the licenses granted to [Roche] in the License Agreement."[87]

### 9. Meso acquires BioVeris's interest in MSD

On February 13, 2004, the 2003 transaction closed, terminating the joint venture between IGEN and MST, and causing BioVeris to assume IGEN's 31% interest in MSD. Shortly thereafter, MST exercised its right to buy out BioVeris's ownership in MSD, a process that was completed in December 2004.[88] As part of MST's buyout of BioVeris's stake in MSD, three appraisers, Wilamette Management Associates ("Wilamette"), Houlihan Lokey Howard & Zukin ("Houlihan"), and Erickson Partners LLC ("Erickson"), were retained to value MSD. As part of the appraisal process, MSD was asked to provide, among other things, lists of its intellectual property and of its key

---

[86]   *Id.* This 65% figure was designed to prevent Roche from profiting from out-of-Field sales. *See* Tr. 1052 (Nuechterlein) (stating that the "65 percent royalty" "would essentially turn over the profit from those sales to [IGEN].").

[87]   JTX 263 at ROCHE0055887.

[88]   JTX 601 at 9.

agreements. During that process MSD never identified itself as a licensor under the 2003 License Agreement.

### 10. The Field Monitor process and out-of-Field sales

After the 2003 transaction closed, Roche undertook several measures to attempt to ensure its compliance with the Field limitations delineated in the 2003 License Agreement. These measures included providing certain training to its sales staff and placing the requisite labels on its products and instruments. In October 2004, Roche invited BioVeris to participate in the Field Monitor process, but BioVeris did not respond. In October 2005, Roche issued a similar invitation to BioVeris again. By this time, BioVeris suspected that "Roche was selling ECL products to customers who were using the products outside the permitted field of use."[89] Accordingly, BioVeris accepted Roche's invitation, and in early 2006, the two sides began the Field Monitor process.

Between 2004 and 2006, Meso had no contact with Roche. On June 16, 2006, Wohlstadter and Meso learned for the first time from BioVeris's public filings that an issue potentially existed regarding Roche selling out of Field.[90] There is no evidence that either of them had taken any affirmative steps to monitor Roche's sales before then. After learning of the potential issue, Meso neither demanded that Roche stop selling out-of-Field nor did it participate in the Field Monitor process. Instead, Meso remained a passive observer as BioVeris asserted its enforcement rights under Section 2.5 of the

---

[89]     JTX 489 at 17.

[90]     Tr. 141 (Wohlstadter).

27

License Agreement. Meso took this relatively passive approach even though its joint venture agreement with IGEN had terminated when the 2003 transaction closed, and, thus, its interests were not as strongly aligned with BioVeris as they had been with IGEN before the 2003 transaction.

As BioVeris and Roche worked to determine the scope of Roche's liability for inadvertent out-of-Field sales, the two sides began discussing a number of possible solutions to their dispute. One such solution proposed by BioVeris as early as July 2006 was for Roche to acquire BioVeris.[91] Another structure Roche and BioVeris considered was an expansion of the 2003 License Agreement. On October 2, 2006, Roche sent BioVeris a draft agreement that would provide Roche with "an expanded license for ECL technology unencumbered by product or field limitations."[92] Similar to the 2003 License Agreement, the definition of "Parties" in the proposed expanded license did not include either MSD or MST, and MSD and MST would be asked to "consent to and join in the licenses, waivers, and releases" that BioVeris would be granting to Roche in the expanded license.[93]

The record shows that between October 2006 and March 2007, BioVeris and Roche engaged in a "dual track" process in which both sides considered simultaneously the possibility of Roche either acquiring BioVeris or receiving an expanded license

---

[91]   *Id.* Roche first indicated it would consider acquiring BioVeris in September 2006.

[92]   JTX 382 at FL0047929.

[93]   *Id.* at FL0047949.

related to ECL technology. For example, in late December 2006, Roche made a "preliminary non-binding proposal" to acquire all of BioVeris for $400.7 million.[94] In early January 2007, however, Roche asked BioVeris to enter into a letter agreement with MSD and MST in which the Meso entities would limit their rights to restrict BioVeris's "exercise of the Licensed ECL Technology," as defined in the License Agreement.[95]

On February 27, 2007, BioVeris informed Roche that if it wanted BioVeris to modify its relationship with MSD, Roche should negotiate those changes directly with MSD. This led Roche's outside counsel to conduct additional diligence on MSD.[96] Thereafter, on March 8, 2007, Roche informed BioVeris "that, for the time being, Roche was willing to proceed with [an acquisition of BioVeris] without obtaining modifications with MSD."[97]

Roche's about-face with respect to the need to involve Meso in its acquisition of BioVeris appears to have been driven primarily by four factors. First, BioVeris then was selling its "M-Series" instruments for out-of-Field uses without any challenge or

---

[94]    JTX 489 at 18.

[95]    JTX 422 at FL0012486. In later correspondence, Roche described the proposed letter agreement as a "key document" because "Roche will be able to achieve freedom to operate only with such a resolution with MSD." JTX 439 at ROCHE0030613.

[96]    JTX 492 at ROCHE0100788. This additional diligence, however, appears to have been limited to two lawyers spending a single day reviewing Meso's research summaries.

[97]    *Id.*

objection from Meso.[98] These instruments used the same single-cell, permanent electrode ECL technology that BioVeris had licensed to Roche in the License Agreement. Second, the Research Program that potentially could be the source of "growing rights" for MSD had terminated with the joint venture in 2004, thus providing a clear limitation on the rights MSD might procure through that component of the 1995 License.[99] Third, BioVeris had represented to Roche that, even if Roche acquired BioVeris, MSD did not have any rights that would interfere with the deal they were contemplating.[100] Finally, notwithstanding its less-than-exhaustive review of MSD's research summaries, Roche considered those summaries sufficiently complete that it was confident that it could achieve its goals regarding access to the necessary ECL technology by acquiring BioVeris without involving Meso at all.

On April 4, 2007, about a month after Roche informed BioVeris that it was prepared to go ahead with a deal without Meso, the two sides announced jointly that Roche had agreed to acquire BioVeris for $599 million.[101]

### 11. Roche and Meso's interactions after the BioVeris transaction

Wohlstadter learned that Roche would be acquiring BioVeris by way of a phone call from IGEN executives on the morning of April 4, 2007.[102] Wohlstadter was "very

---

[98]    JTX 364 at BV0021346.  One of these uses was for clinical trials.  *Id.*

[99]    JTX 48 at MESO00053171, MESO00053202; JTX 260 at ROCHE0056136.

[100]    JTX 443 at FL0012843, FL0012846.

[101]    JTX 476.

30

upset" that the two sides were executing a deal without him and Meso. Nevertheless, neither he nor Meso took any action to attempt to stop the deal from closing. Rather, between June 20 and June 22, 2007, Wohlstadter wrote three letters to Roche seeking assurances that Roche would honor BioVeris's contractual commitments to Meso.[103] Notably, however, none of these letters specifically referred to the 2003 License Agreement, nor did they purport to challenge the pending deal between Roche and BioVeris.

On June 26, 2007, Roche's acquisition of BioVeris closed.[104] Effective the same date, BioVeris granted its new owner, Roche, a non-exclusive license to the Licensed ECL Technology "for use in any and all fields" subject to "the rights of MSD, MST, and Jacob Wohlstadter under all pre-existing agreements."[105]

After the acquisition closed, Meso and Roche engaged in a series of negotiations about a number of issues arising from the acquisition. These negotiations included meetings, either in person or telephonically, in July, August, October, and December of 2007, as well as January, March, April, and December 2008. Indeed, by as late as April 2009, Meso and Roche still were attempting to reach a mutually acceptable resolution to

---

[102]  Tr. 151–52 (Wohlstadter).

[103]  JTX 509.

[104]  JTX 520 at 2.

[105]  JTX 514 § 2.1.

their dispute.[106] Eventually, however, Roche informed Meso that it had no intention of settling the dispute. Plaintiffs then commenced this litigation.

## C. Procedural History

Plaintiffs initiated this action on June 22, 2010 by filing their verified complaint (the "Complaint"). In the Complaint, Plaintiffs asserted causes of action for breach of the Global Consent (Count I) and breach of the License Agreement (Count II), seeking both monetary and equitable relief. On September 2, 2010, Defendants moved to dismiss the Complaint in its entirety. I denied that motion in an April 8, 2011 Memorandum Opinion,[107] but ordered that the prosecution of Count II be stayed pending a decision by a New York arbitration panel on whether Plaintiffs had standing to demand that the claims in that count be arbitrated. In April and May 2012, the arbitration panel heard testimony from eight witnesses over four days. On September 10, 2012, the arbitration panel concluded that Meso's claim for breach of the License Agreement was not arbitrable.

After full discovery, on September 17, 2012, Defendants moved for summary judgment on both counts in the Complaint. At argument on Defendants' motion on November 5, 2012, I confirmed the arbitration panel's final award and lifted the stay as to Count II. As to Count I, Defendants argued that Roche's acquisition of BioVeris did not breach the terms of the Global Consent and that that count of the Complaint was time-

---

[106]    JTX 572.

[107]    *Meso Scale Diagnostics v. Roche Diagnostics GmbH*, 2011 WL 1348438, *19 (Del. Ch. Apr. 8, 2011).

barred. Regarding Count II, Defendants continued to assert that Plaintiffs are not "Parties" to the 2003 License Agreement, and, thus, have no standing to enforce its provisions. In a Memorandum Opinion entered on February 22, 2013,[108] I granted Defendants' motion for summary judgment as to Count I, but denied it as to Count II on the grounds that the phrase "join in the licenses granted" in the consent attached to the License Agreement is ambiguous as to whether it makes Plaintiffs parties to the License Agreement.

From February 25 through March 1, 2013, I presided over a five-day trial on Count II. After post-trial briefing, counsel presented their final arguments on November 8, 2013. This Memorandum Opinion constitutes my post-trial findings of fact and conclusions of law in this matter.

### D. Parties' Contentions

Meso argues that the plain meaning of its agreement to "join in" the licenses granted to Roche in the 2003 License Agreement makes it a party to that agreement with corresponding rights to enforce its terms. Meso avers further that, even if it is not considered a party to the License Agreement based on the plain meaning of the consent, the parol evidence presented at trial establishes that it, Roche, and IGEN intended to have Meso license its ECL rights to Roche and become a party to the License Agreement. Alternatively, Meso asserts that if it is not a party to the entire License Agreement, the

---

[108] *Meso Scale Diagnostics v. Roche Diagnostics GmbH*, 62 A.3d 62, 88 (Del. Ch. 2013).

evidence shows that, at a minimum, it is a party to Article 2, which contains the provisions of the License Agreement Meso seeks to enforce through this litigation. According to Meso, Defendants have failed to offer any reasonable competing interpretation of the consent that would preclude a finding that it is a party to the License Agreement. Regarding remedies for Defendants' alleged breach of the License Agreement, Meso argues that it is entitled to both specific performance of the License Agreement's Field restrictions and Field Monitor provisions as well as monetary damages. The monetary damages would apply, at a minimum, to Roche's intentional out-of-Field sales since 2007. According to Meso, those damages could be as high as $436 million.

In response, Defendants deny that Plaintiffs are, or ever have been, parties to the 2003 License Agreement and, thus, maintain that Plaintiffs have no standing to enforce its provisions. Defendants contend that the phrase "join in" does not have a singular meaning under New York law that automatically would make Plaintiffs parties to the License Agreement. Moreover, Defendants assert that parol evidence, including, for example, the drafting history of the License Agreement and the course of dealing between Plaintiffs and Defendants after 2003, supports their interpretation of the agreement as not including Plaintiffs as parties. Defendants also make an alternative argument regarding Article 2 of the License Agreement. According to Defendants, to the extent Meso "joined in" the License Agreement at all, they joined only the licenses granted in Article 2 and none of the covenants in that Article that Meso now seeks to enforce. Stated differently, Defendants aver that, at most, Meso granted Roche certain

rights, but did so without obtaining any corresponding enforcement rights in return. As to potential remedies, Defendants argue that, to the extent they are liable for breach of contract, Meso only is entitled to nominal damages.

## II. ANALYSIS

Both sides in this dispute agree that Meso's breach of contract claim is governed by New York law. Thus, the focus of this litigation is whether, under New York law, Roche is liable to Meso for breaching the terms of the License Agreement. I address that question next.

### A. Legal Standard

To prevail on a claim for breach of contract, a plaintiff must prove by a preponderance of the evidence "the formation of a contract, performance by the plaintiff, breach and resulting damage."[109] In this litigation, the key inquiry pertains to the first element: did Meso become a party to the License Agreement by virtue of the "join in" language in the consent?[110] The two sides have advanced competing constructions of the "join in" language and have asked this Court to interpret the License Agreement to determine which side's construction is more reasonable.

---

[109] *McCormick v. Favreau*, 919 N.Y.S.2d 572, 577 (App. Div. 2011).

[110] Section 14.11 of the License Agreement, entitled "No Third Party Beneficiary Rights," states in relevant part that "nothing in this Agreement is intended to confer upon any person other than the Parties hereto and their respective successors and permitted assigns, any benefit, right, or remedy under or by reason of this Agreement." JTX 263 § 14.11 at ROCHE0055885. Meso has not argued, nor could it argue, that it has any right to enforce the License Agreement in any capacity other than as a party.

35

Under New York law, "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent."[111] Because the written agreement itself is the best evidence of the parties' intent, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."[112] A contract is unambiguous if the language it uses has "a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion."[113] "Further, a contract should be 'read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.'"[114] In that regard, "[t]he meaning of a writing may be distorted where undue force is given to single words or phrases."[115] "Parol evidence—evidence outside the four corners of the document—is admissible only if a court finds an ambiguity in the contract."[116]

---

[111] *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (N.Y. 2002).

[112] *Id.*

[113] *Id.* (quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (N.Y. 1978)).

[114] *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324 (N.Y. 2007) (quoting *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (N.Y. 2003)).

[115] *Westmoreland Coal Co.*, 100 N.Y.2d at 358.

[116] *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (N.Y. 2013). Parol evidence includes, but is not limited to, the parties' negotiating history and earlier drafts of the agreement that requires interpretation.

## B.      Meso is Not a Party to the Entire License Agreement

Throughout this litigation, Meso has argued that it is a party to the License Agreement by virtue of the "join in" language in the consent attached to that agreement. As an initial matter, I note that Meso did not "join in" the License Agreement in its entirety. It only "consented" to the License Agreement as a whole, and "join[ed] in the licenses granted . . . in the License Agreement."[117] Thus, even assuming that the phrase "join in" is sufficient to make Meso a party to the License Agreement, I find unpersuasive Meso's assertion that that phrase makes them a party to the entire License Agreement when the phrase was used only to describe Meso's relationship with the "licenses granted," and specifically was not utilized to explain Meso's status relative to the License Agreement as a whole.[118]

---

[117]      JTX 263 at ROCHE0055887.

[118]      Meso argues that because the "License Grant" in Section 2.1 makes the licenses granted "subject to the terms and conditions of this Agreement," that by "joining in" the licenses granted, Meso, in effect, joined in the entire License Agreement. One flaw with this interpretation of the "join in" phrase is that it arguably renders Meso's "consent to" the License Agreement superfluous. If Meso "joined in" the entire License Agreement as a party, its additional "consent to" the agreement would be meaningless because it already would have expressed its acceptance of the License Agreement by becoming a party to each of its provisions. Thus, the License Agreement arguably is ambiguous as to whether "join[ing] in the licenses granted" is equivalent to "joining in" the entire agreement. Any ambiguity in that regard, however, was resolved by the decision of the arbitration panel, which I discuss next.

It is of great significance, however, that the arbitration panel already has determined that Meso is not a party to at least one section of the License Agreement. Section 6.2(b) of the License Agreement states that:

> Any dispute or other matter in question between [Roche] and IGEN arising out of or relating to the formation, interpretation, performance, or breach of this Agreement, whether such dispute or matter arises before or after termination of this Agreement, shall be resolved solely by arbitration if the Parties are unable to resolve the dispute through negotiation pursuant to Section 6.1 hereof.[119]

Meso litigated before an arbitration panel the issue of whether it was a party to the License Agreement in the sense that it had a corresponding right to invoke Section 6.2 of the agreement for purposes of resolving its breach of contract claim (*i.e.*, Count II of the Complaint) against Roche. As noted in this Court's February 22, 2013 decision regarding Roche's motion for summary judgment,

> [t]he Arbitration Panel was tasked with determining whether or not the dispute as to Count II was arbitrable. The Panel ultimately determined that they did not have jurisdiction to hear the [breach of the License Agreement] claims. They based that determination, at least in part, on a finding that when MSD and MST consented to and "join[ed] in the licenses granted" in the [License Agreement], they did not also become parties to the arbitration provision in that agreement. *That finding is entitled to issue-preclusive effect here*.[120]

---

[119]     *Id.* at ROCHE0055871-72.

[120]     *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 90 (Del. Ch. 2013) (emphasis added). There has been no showing that this determination was clearly erroneous or that there has been an important change in circumstances that would warrant a different outcome. As such, my conclusion as to the preclusive effect of the arbitration panel's decision is law of the case. *See*

Therefore, at a minimum, it has been determined conclusively that Meso is not a party to Section 6.2 of the License Agreement, and, thus, it is not a party to the *entire* License Agreement. That determination, however, is not dispositive as to Meso's claims here because "the promises Meso seeks to enforce are found in §§ 2.5 and 2.6" of the License Agreement.[121] Accordingly, although Meso is not a party to the entire License Agreement, I still must consider whether Meso is a party to some or all of Article 2 and has the right to enforce Sections 2.5 and 2.6.

## C.    Whether Meso is a Party to Any Part or All of Article 2 is Ambiguous

Meso and Roche agree that, in the phrase "consent to and join in the licenses granted" used in the consent attached to the License Agreement, the terms "consent to" and "join in" have different meanings.[122] Meso avers, however, that by agreeing to "join in the licenses granted" it became a party to all of Article 2 of the License Agreement and

---

*Hamilton v. State*, 831 A.2d 881, 889 (Del. 2003) ("The prior rulings of a court must stand *unless* those rulings were *clearly in error* or there has been an important change in circumstance.") (internal quotations and citations omitted).

[121]   Pls.' Opening Br. 31. In that regard, the arbitration panel did not make any determination entitled to issue-preclusive effect in this litigation as to whether Meso was a party to any part of the License Agreement other than Section 6.2. *Meso Scale Diagnostics,* 62 A.3d at 90.

[122]   This is consistent with the "presumption against surplusage," a recognized canon of contract construction under New York law. *See Olin Corp. v. Am. Home Assurance Co.,* 704 F.3d 89, 99 (2d Cir. 2012) (quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("Any interpretation of a contract that 'has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'")).

39

obtained corresponding enforcement rights. Roche disagrees. In support of its argument, Meso cites case law supporting the proposition that "one who joins in a contract between two other parties by assuming obligations under that contract becomes a party with the same corresponding rights and obligations as the other parties."[123] In response, Roche contends that "the most reasonable construction [of 'join in'] is that the term was intended to mean something more than mere consent but less than becoming a party and obtaining enforcement rights."[124] This interpretation, according to Roche, comports with the terms of the License Agreement as a whole, which contemplates IGEN being Roche's sole licensor of ECL Technology. Roche asserts further that, to the extent Meso is a party to the License Agreement, it only is a party to the license grant provisions, Sections 2.1 and 2.7, and has no rights to enforce the terms of Sections 2.5 and 2.6.

The Court's first task in resolving the disparity between the competing interpretations of the License Agreement advanced by Meso and Roche is to decide whether the relevant language of the License Agreement is ambiguous. In ruling on Roche's motion for summary judgment, I held explicitly that "the meaning of the 'join in the licenses granted' language" in the consent "attached to the [License Agreement] is ambiguous," and that "it will be necessary to consider extrinsic evidence on the question

---

[123]    Pls.' Opening Br. 22–23.

[124]    Defs.' Opening Br. 26.

40

of MSD and MST's ability to enforce the License Agreement."[125]  Based on the evidence

and arguments presented at trial, I adhere to that prior holding.

Initially, I note that the term "join in" does not appear to have a singular meaning

under New York law.[126]  In addition, neither side to this dispute has presented evidence

that "join in" is a term of art with a specific meaning in the context of this litigation.[127]

Nevertheless, relying heavily on a decision of the United Stated District Court for the

District of Columbia in *Institut Pasteur v. Chiron Corp.*,[128] Meso argues that based on the

"join in" language, it is, as a matter of law, a party to at least Article 2 of the License

Agreement.  I disagree.

In *Institut Pasteur*, the issue before the District Court was whether Institut Pasteur

was bound by an arbitration agreement in a 1993 cross-license agreement that it had

signed.  Although the preface of the cross-license did not list Institut Pasteur as one of the

---

[125]   *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 93 (Del. Ch. 2013).

[126]   *See*, *e.g., New York Cent. R. Co. v. New York, N.H. & H.R. Co.*, 208 N.Y.S.2d 605, 616 (N.Y. Sup. Ct. 1960), *modified,* 216 N.Y.S.2d 928 (N.Y. App. Div. 1961) (recognizing that although based on the facts of the case "[t]he court need not explore the countless varied associations in which the phrase ['to join'] might be used, nor conjecture the varied possibilities of its significance," "'to join' may be passive in significance or it may denote active participation in formulation of an activity.").

[127]   In fact, there was no evidence presented at trial that any of Meso, IGEN, or Roche ever had any discussions, oral or written, regarding the meaning of "join in" during the negotiations that led up to the 2003 transaction.

[128]   2005 WL 366968 (D.D.C. Feb. 16, 2005).

41

entities which the agreement was "made by and among," the preface concluded with a statement that Institut Pasteur "joins in this Agreement for the purposes set forth herein."[129] The body of the agreement itself contained numerous specific references to Institut Pasteur, which the District Court found gave "rise to clear rights and obligations on the part of Institut Pasteur."[130] In addition, Institut Pasteur signed the cross-license agreement in the same place in the document as the other "parties" to the agreement.[131]

In a post-trial decision, the court in *Institut Pasteur*, after considering extensive parol evidence, found that Institut Pasteur was a party to the cross-license agreement and was bound by its arbitration provision. One of several factors relied on by the *Institut Pasteur* court in reaching that conclusion was that Institut Pasteur had assumed a number of obligations within the body of the cross-license agreement itself.[132] In that context, the District Court stated that "[t]here is no authority for the notion that an individual or

---

[129] *Id.* at *2.

[130] *Id.* at *10.

[131] *Id.* at *3. The only difference between Institut Pasteur's signature block and the other signature blocks was that it had the phrase "For Approval and as to Section 2.8" written above it. *Id.*

[132] The court in *Institut Pasteur* also noted, among other things, that: (1) Institut Pasteur's signature appeared in the agreement itself, under language reading "the parties have duly executed this Agreement on the date(s) written below; (2) Institut Pasteur was involved with the negotiations of the cross-license agreement from the inception of the negotiations and was involved specifically in negotiations surrounding the arbitration provision; and (3) Institut Pasteur had described itself as a party to the cross-license agreement in at least one communication with another party to the agreement after its execution.

company can 'join in' a contract—at least in the sense of assuming obligations directly under the contract—in some capacity other than as a party."[133]

*Institut Pasteur* does not compel the conclusion that Meso unambiguously is a party to the License Agreement. I note, for example, that the "join in" language in *Institut Pasteur* arguably was more definitive than the analogous language in this case. Furthermore, Institut Pasteur was mentioned numerous times in the body of the agreement at issue, and Institut Pasteur signed the agreement in the same manner as the other "parties" to that agreement. Nevertheless, the court still found the agreement ambiguous and, therefore, considered parol evidence. The textual support for Meso's argument that it is a party to the License Agreement is not nearly as strong as it was for the plaintiff in *Institut Pasteur*. Thus, the need to consider parol evidence in this litigation is manifest. Moreover, it is unclear what, if any, obligations Meso assumed "directly under the" License Agreement by agreeing to "join in" the licenses granted thereunder. In *Institut Pasteur,* the cross-license agreement explicitly referenced Institut Pasteur's obligations. In this case, Meso's "obligations" are contained in a separately executed "consent" attached to the License Agreement. Contrary to Meso's assertions otherwise,[134] I consider that fact a relevant distinction.

---

[133]     *Institut Pasteur*, 2005 WL 366968 at *11.

[134]     Meso cites the case of *Jasper v. Bovina Music, Inc.,* 314 F.3d 42 (2d Cir. 2002), in support of its argument that it is irrelevant that Meso signed the consent and not the License Agreement itself. In *Jasper*, certain individuals were deemed signatories to a contract between other parties based on their having executed an "addendum" to that contract which stated that the individuals signing the

43

In addition, the License Agreement not only specifies that it is "by and between" IGEN and Roche, but also goes further to define the "Parties" as IGEN and Roche. Meso does not appear in the body of the License Agreement in any meaningful way, and it signed a "consent" that was attached to the License Agreement, not the agreement itself.[135] Furthermore, other than the "join in" reference, the consent here is devoid of language suggesting that Meso is a party to or bound by the License Agreement. Based

---

addendum "assent[ed] to the execution of [the] agreement and agree[d] to be bound by the terms and conditions thereof." *Id.* at 45–46. The consent signed by Meso is readily distinguishable from the "addendum" in *Jasper*, because the consent lacks clear and unequivocal language that Meso is agreeing to be "bound by the terms and conditions" of the License Agreement as a party.

[135] In that regard, this case also is distinguishable from *Digene Corp. v. Ventana Med. Sys., Inc.*, 316 F. Supp. 2d 174 (D. Del. 2004). In *Digene*, another post-trial decision in which parol evidence was utilized to interpret a contract, the court recognized that "New York law has long held that a signatory may be bound by, and thus a party to, a contract, even though the signatory is not named as a party in the body of the contract." *Id.* at 183. On that basis, in conjunction with certain judicial admissions made by one of the parties and the parties' course of conduct after execution of the agreement at issue, the court in *Digene* found that a signatory to the agreement itself was a party to that agreement despite not being named as such in the body of the contract. Therefore, *Digene* holds only that a signatory *may* be a party to a contract even if it is not identified as such in the agreement itself, not that, in general, it must be a party or even that it likely will be a party. As it pertains to this litigation specifically, I note that Meso signed an attached consent, not the License Agreement itself. Furthermore, *Digene* has been distinguished by at least one court, which held that a more accurate statement of New York law is that "where a third party merely annexes his name to a contract in the body of which he is not mentioned, and which is a complete contract between other parties signing it and mentioned in it, such third person does not thereby become a party to the efficient and operative parts of the contract, his signature in such case being only an expression of assent to the act of the parties making the contract." *In re Palmdale Hills Prop.*, 2011 WL 7478771, at *7 (Bankr. C.D. Cal. Nov. 3, 2011) (quoting *In re Wirth*, 355 B.R. 60, 63-64 (N.D. Ill. 2005)).

on these facts, one reasonable construction of the consent to the License Agreement is that Meso, consistent with Roche's interpretation of the consent, never became a party to the License Agreement by virtue of "joining in" the licenses that were being granted. On the other hand, based on the case law that Meso has cited and the lack of clarity in some of the contractual language in dispute, I cannot say from the four corners of the consent and other relevant documents that Meso's claim to being a party to the License Agreement is necessarily unreasonable. Therefore, because the consent to the License Agreement is ambiguous as to whether it makes Meso, in any way, a party to the License Agreement, I must analyze the relevant documents and related parol evidence to resolve that ambiguity and determine the most reasonable interpretation of the consent.

D.     **The Drafting History of the License Agreement Supports the Conclusion that Meso Did Not Become A Party To the License Agreement Through the "Join In" Language in the Consent**

Before turning to the drafting history of the License Agreement itself, it is helpful to frame the context in which the negotiations regarding the 2003 transaction and the License Agreement took place. The record shows that, from Roche's perspective, a fundamental purpose of the 2003 transaction was to obtain sufficient ECL-related rights such that it could operate inside of the defined Field without interference from IGEN or Meso. At the time the 2003 transaction was being negotiated, Meso's ECL-related rights pertained largely to the use of ECL outside of the Field (*i.e.,* in regard to Multi-Array Assays)[136] and Meso, a significantly smaller and less established company than Roche,

---

[136]     The term Multi-Array Assay is defined in Section 1.9 of the License Agreement.

45

wished to avoid having to compete with Roche in areas related to Multi-Array Assays, where Meso historically had been engaged in ECL-related research and development.[137]

Against the background of this difference in focus (Roche on in-Field ECL use and Meso on Roche's potential out-of-Field ECL use), during the negotiations leading up to the 2003 transaction, it was uncertain what, if any, in-Field ECL-related rights Meso had. This uncertainty stemmed from two things: (1) the amorphous scope of Meso's Research Program and Research Technologies under the 1995 License Agreement, as amended; and (2) the unknown scope of Meso's "springing rights" under that agreement. At the time of the negotiations, the relatively inexact nature of Meso's "springing rights" threatened to, at a minimum, create uncertainty as to Roche's ability to operate uninhibitedly within the Field in the *future*. If Meso's "springing rights" came to fruition after Roche's execution of the License Agreement with IGEN, it was conceivable that the License Agreement itself would not give Roche the in-Field protection it wanted for the entirety of the agreement's duration.

Therefore, at the time the 2003 transaction was being negotiated, Roche seems to have tried to ensure that Meso's ill-defined ECL-related rights, both then and in the future, would not preclude Roche from enjoying the unfettered use of ECL Technology in the Field that it desired. Roche's need to resolve or mitigate these uncertainties, and the

---

[137]    One area of particular importance to Meso appears to have been clinical trials related to the development and approval of pharmaceutical drugs. Such clinical trials are excluded expressly from the definition of "Field." JTX 263 § 1.7(b) at ROCHE0055865.

46

manner in which it attempted to do so, lies at the heart of this dispute. From Meso's perspective, communications with IGEN and the JVOC focused primarily on minimizing out-of-Field activities by Roche. With that framework in mind, I turn to an examination of the License Agreement's drafting history.

### 1. The early negotiating documents

In arguing that the drafting history of the License Agreement supports its construction of the attached consent, Meso relies most prominently on two documents prepared by IGEN: a November 23, 2002 "Summary of Key Differences between IGEN and Roche Drafts of License Agreements between [IGEN] and [Roche]"[138] and a January 17, 2003 mark-up of a draft license agreement.[139] In the "Summary of Key Differences," IGEN observed that Roche, in its most recent proposed draft of the License Agreement, wanted a "grant of rights from both IGEN and its Affiliates,"[140] and that Roche wanted "MSD and MST to join in the License Agreement (both licenses and covenants not to sue)."[141] The January 17 mark-up contained a comment from IGEN in Section 2.1, the grant clause, stating that "Roche is concerned (1) that there are springing exclusive rights in Meso that would preclude granting of these non-exclusive rights to Roche . . . ."[142]

---

138    JTX 104 at CSM0033045.

139    JTX 118.

140    JTX 104 at CSM0033048. In this draft of the License Agreement, the definition of "Affiliates" included MSD and MST. *Id.* at CSM0033021.

141    *Id.* at CSM0033052.

142    JTX 118 at ROCHE0038195.

47

According to Meso, these documents show that Roche wanted Meso to "join in" the licenses granted so that it could obtain a license from Meso. The documents, however, do not constitute meaningful evidence in support of that proposition.[143]

As to the "Summary of Key Differences," the evidence suggests that Roche had never seen that document before this litigation,[144] and the language that Meso emphasizes from the chart merely parrots the language used in the body of a November 2002 mark-up itself. In other words, the document reflects no analysis or interpretation of the relevant language, just a mechanical copying and pasting of it. Therefore, the "Summary of Key Differences" provides little, if any, insight about IGEN's "understanding" of what Roche was pursuing from Meso. Regarding the January 17 mark-up, the fact that IGEN recognized that Roche had concerns about Meso's "potential springing rights," in and of itself, does not assist the Court in determining the most reasonable interpretation of "join in."[145] In this draft, Roche did ask for a grant of rights from IGEN and its "Affiliates."

---

[143] I note initially that the most recent of these documents was prepared in January 2003, approximately six months before the License Agreement was finalized. In the six months between the January 2003 draft and the announcement of the 2003 transaction, Roche and IGEN, on behalf of itself and Meso, engaged in extensive negotiations surrounding the License Agreement that resulted in material changes to the content of that agreement. This fact also undercuts the probative value of Meso's evidence for purposes of deciding its breach of contract claim.

[144] Tr. 615–16 (Steinmetz).

[145] As of January 17, 2003, Section 9.6 of the License Agreement, which contains important representations and warranties by IGEN about its ability to grant the licenses contemplated in the License Agreement, was not in final form. *Compare* JTX 118 § 9.6 at ROCHE0038205 and JTX 263 § 9.6 at ROCHE0055877. The final version of Section 9.6 arguably reduced or eliminated the uncertainty Roche

48

Yet, the "join in" language appeared in the same consent in which there was proposed language to the effect that Meso had no rights in the ECL Technology being licensed to Roche and a footnote indicating that Roche was "considering whether a formal license of ECL Technology from MSD/MST to [Roche] may be necessary to assure [Roche]'s access to all ECL Technology."[146]  Read as a whole, the January 17 mark-up raises several questions about the meaning of "join in," such as: (1) if Meso explicitly was granting rights to Roche in the body of the draft, what added benefit would be provided by Meso "joining in" the licenses granted?; (2) why would Roche ask for a grant of rights from Meso when it was asking simultaneously that Meso represent that it had no relevant rights in ECL Technology?; and (3) why would Roche consider seeking a formal license from Meso if it believed that Meso was a party to the license agreement and had given it a license by virtue of "joining in" the licenses granted?  In sum, the January 17 mark-up is neither conclusive nor persuasive evidence that Roche intended to make Meso a party to the License Agreement through the "join in" language in the consent.

The November 2002 and January 2003 documents Meso relies upon, therefore, provide minimal, if any, support for an inference that IGEN's understanding of Roche's position as to the License Agreement at that time was that Roche wanted a license from Meso and wanted Meso to be a party to the License Agreement.  Moreover, the weight of

had concerning IGEN's ability to grant the necessary licenses and concomitantly the need for Roche to obtain a grant of rights from Meso.

[146]    JTX 118 at ROCHE0038211.

49

that evidence is undermined significantly by the fact that not a single IGEN representative testified that they believed that Meso was a party to the License Agreement or that Roche was seeking a license from Meso. To the contrary, IGEN's CFO and General Counsel each credibly denied that Meso was a party to the License Agreement or a licensor thereunder.[147] Thus, regardless of what objectives IGEN may

---

[147] Migausky Dep. 43; Abdun-Nabi Dep. 283. Abdun-Nabi was not involved in negotiating the consent and had no specific understanding of what "join in" was supposed to mean. Abdun-Nabi Dep. 238, 249. Nevertheless, as IGEN's General Counsel, Abdun-Nabi was familiar with the overall purpose and scope of the 2003 transaction generally, and the License Agreement specifically. Therefore, I find Abdun-Nabi's general understanding of Meso's relation to the License Agreement, as stated in the following exchange, to be credible and helpful in deciding the issue before me: "Q: So fair to say that you don't have a position on how the phrase consent to and join in the licenses granted in the license agreement should be interpreted in this litigation? A: Well, what I would say is that it should not be interpreted as though they were a full party to the license agreement, because to me, that was never my understanding, nor do I think it was our board's understanding, nor do I think it's consistent with anything that we publicly disclosed. They were not parties to the license agreement. *They were being asked to provide certain assurances and consents and waivers to give Roche comfort that what they were getting was what they sought*. And we never disclosed it as they were parties to this agreement or they had underlying rights to the agreement. We never -- I never understood that. I never communicated that to the board, to my recollection. *But there were some ancillary assurances that Roche was seeking, sought, negotiated for and secured*, and MSD and MST and Jacob were in active discussions around that, and ultimately agreed to whatever language that is here . . ." *Id.* at 282–83 (emphasis added). In addition, the fact that Abdun-Nabi was not involved in any detailed negotiations over the consent supports the conclusion that the consent did not make Meso a party to the License Agreement. If Meso was made a party to the License Agreement, that would affect both Roche's and IGEN's rights under the agreement. There is no evidence to support the inference that, in this highly negotiated transaction, IGEN was willing to allow Roche to add additional parties to the License Agreement without its explicit knowledge or consent (or at a minimum, the knowledge or consent of its General Counsel).

50

have thought Roche was pursuing at some earlier stage in the negotiations,[148] the weight of the evidence supports the conclusion that when the License Agreement was finalized in July 2003, IGEN, like Roche, did not believe Meso was a party to that agreement or otherwise had the right to enforce its provisions.

### 2. The documents regarding the nature of the ECL Technology

Exhibit A to the License Agreement, entitled "ECL Patent Rights" is a 27-page list of IGEN's patents related to ECL technology. In Section 9.7 of the agreement, to which Meso consented, IGEN represented and warranted to Roche that "Exhibit A includes *all patents and patent applications* which: (a) exist at or prior to the Effective Time; (b) are owned and/or controlled by IGEN and/or any Affiliate thereof; and (c) cover ECL Technology."[149]

As discussed *supra,* Roche wanted a license to any ECL Technology that IGEN possessed in the Field to commercially exploit Products.[150] The License Agreement defined "Product(s)" to mean "ECL Instruments, service of ECL Instruments and spare

---

[148]   As of January 2003, Meso had not yet signed a confidentiality agreement with Roche and was not participating, at least directly, in the negotiations over the License Agreement.

[149]   JTX 263 § 9.7 at ROCHE0055878 (emphasis added).

[150]   *Id.* § 2.1 at ROCHE0055867. This finding is supported further by the fact that the License Agreement provides that if it is discovered that any patents or patent applications have been omitted from Exhibit A, Roche automatically is entitled to a license to those patents and patent applications as of the date the License Agreement was executed. *Id.* § 9.7 at ROCHE0055878.

parts; and ECL Assays."[151]  The agreement also defined "ECL Assays" as not including "a Multi-Array Assay" and an "ECL Instrument" as an instrument that, among other things, "cannot perform any Multi-Array Assay."[152]  Generally speaking, in 2003, Meso's business involved predominantly Multi-Array Assays which were outside of the Field.

The requirement in the License Agreement that IGEN list each of the patents and patent applications that it or an Affiliate owned or controlled covering ECL Technology supports a reasonable inference that it was a condition precedent for Roche to understand the scope of rights it was receiving before accepting a license from a potential licensor of ECL Technology (or any other) rights.  Conspicuously absent from the License Agreement, the consent, any of the other key documents from the 2003 transaction, or any draft of any of those documents, is a similar list or other description of Meso's rights in ECL Technology. Without a list or description of Meso's ECL-related rights associated with any of the 2003 transaction documents, the question becomes, if Meso, as it argues, became a party to the License Agreement and granted Roche a license, what rights did it grant to Roche?  Meso argues that it did not provide Roche with a document comparable to Exhibit A to the License Agreement because Roche simply wanted a grant of whatever in-Field ECL rights Meso had.  This argument, however, is unavailing for at least three reasons.

---

[151]  *Id.* § 1.13 at ROCHE0055867.

[152]  *Id.* §§ 1.3(c)(vii) at ROCHE0055863; 1.4(a)(vii) at ROCHE0055864.

First, the 2003 transaction consisted of several complex, interrelated transactions, whose values in the aggregate exceeded $1 billion, and all of which were negotiated heavily by sophisticated parties with the assistance of counsel. The License Agreement was one of the most, if not the most, important elements of the 2003 transaction. In that context, the notion that Roche wished to make Meso a party to the License Agreement less than explicitly to obtain an unspecified and unverified grant of rights is not credible. Second, neither the consent nor any drafts of the consent contain any indication that Meso was granting Roche a license to all of its rights in ECL Technology in the Field or otherwise. Finally, Roche actually wanted rights (albeit limited by the Field) to all of IGEN's technology, yet it still insisted on a detailed list of what those rights were and representations and warranties as to the completeness of that list.[153] With one possible exception, Meso has advanced no cogent argument that explains satisfactorily why Roche would treat IGEN and Meso so differently in terms of requiring them to verify the rights that they were granting to Roche under the License Agreement.[154] Overall, however,

---

[153] Roche proposed Section 9.7 of the License Agreement, entitled "Completeness of Exhibit A" on May 20, 2003. JTX 182 at MESO00009438. By that time, Meso had signed a confidentiality agreement with Roche and was included in distributions of mark-ups of the draft License Agreement. Therefore, Meso was aware of the importance Roche placed on having a detailed understanding of the rights to which it was obtaining a license.

[154] That exception is that Roche recognized that whatever rights Meso might have relevant to the Field would stem from the 1995 Agreement. In particular, it was possible that Meso might acquire certain "springing rights" pertaining to the Field in the future, if certain contingencies were satisfied. There is no reliable evidence in the record that any such rights had materialized definitively as of July 2003 when IGEN and Roche entered into the License Agreement. In these

53

Meso's failure to produce a document comparable to IGEN's Exhibit A is another factor weighing against a finding that Meso was intended to be made a party to the License Agreement by the "join in" language.

### 3.        Key sections of the License Agreement

At least three additional aspects of the drafting history that support Roche's interpretation of the "join in" language in the consent deserve discussion. First, by May 8, 2003, the definition of an IGEN "Affiliate" in the draft License Agreement had changed from specifically including MSD and MST to explicitly *excluding* them.[155] Notwithstanding this change, the grantors of the license under the agreement continued to be "IGEN and its Affiliates"[156] from that point until the License Agreement became final.[157] Thus, while Meso argues that Roche wanted to protect itself by making Meso a party to the License Agreement and obtaining a license from Meso, this drafting history and the absence of any modification to any other portion of the agreement to reflect Meso's putative party status seriously undermine Meso's argument.[158] Indeed, there is no

circumstances, IGEN and Roche may have concluded that the consent attached to the License Agreement that Meso signed adequately protected Roche's expectations.

[155]    JTX 163 § 1.1 at MESO00000777–78.

[156]    *Id.* § 2.1 at MESO00000784.

[157]    JTX 263 § 2.1 at ROCHE0055867.

[158]    The same "join in" language appeared in drafts of the consent both before and after IGEN, Roche, and Meso agreed to remove Meso from the definition of Affiliate.

54

evidence that Roche, IGEN, or Meso made any change to the License Agreement itself or to the consent after Meso was removed from the definition of an IGEN Affiliate that would support a reasonable inference that Meso was a party to the agreement or was granting Roche a license.[159] Therefore, Roche's agreement to exclude MSD and MST from the definition of an IGEN Affiliate is inconsistent with Meso's position that Roche wanted Meso to become a party to the License Agreement through the "join in" language in the consent.

Second, Sections 2.5 and 2.6 of the License Agreement, the sections that Meso wishes to enforce in this litigation, remained largely unchanged from the time that Meso signed a confidentiality agreement with Roche until the execution of the final version of the License Agreement. Therefore, Meso took no active role in negotiating those key provisions. This seems inconsistent with Meso's purported role as a party to, and licensor under, the License Agreement.[160] Moreover, there was credible testimony that there were never any discussions of Meso having enforcement rights under Article 2, or

---

[159] The record shows that the parties excluded MSD and MST from the definition of an IGEN Affiliate because they did not meet the requisite criteria set out in Section 1.1 of the License Agreement. Tr. 608–10 (Steinmetz); Tr. 70–71 (Wohlstadter). The exclusion of Meso from that term, however, also had the effect of removing Meso as an entity that, under the plain language of the License Agreement, was granting Roche rights, and relegating it to the status of an entity that only had agreed to "consent to and join in" a license being granted by others, namely IGEN and its Affiliates.

[160] To the extent Wohlstadter participated in negotiating any part of Article 2 before Meso signed a confidentiality agreement, I already have found that such involvement was in his capacity as a consultant to IGEN, not as a representative of Meso. *See* note 38 *supra* and accompanying text.

55

any other Article or Section, of the License Agreement.[161]  Meso's lack of involvement in negotiating the provisions of the License Agreement it seeks to enforce, as well as the lack of any discussion of Meso's ability to enforce those provisions, buttress my conclusion that Meso was not intended to be a party to any part of the License Agreement or to become a licensor to Roche.[162]

Finally, on May 20, 2003, Roche proposed several additions to Section 9.6 of the License Agreement, a section addressing certain representations and warranties made by IGEN.  In its proposed language, Roche sought additional representations and warranties from IGEN that: (1) "the grant of rights and licenses, and the performance of its obligations hereunder will not conflict with [IGEN's] charter documents or any agreement, contract or other arrangement to which it is a party or by which it is bound"; and (2) "no consent, notice, approval, authorization, waiver or permit, to or from any person, including, but not limited to, any Governmental Entity or third party holder of intellectual property rights is required to be obtained or made by IGEN in connection with its execution and delivery of this Agreement . . . ."[163]  These representations and warranties, with minor modifications, were incorporated into the final version of the

---

[161]  Tr. 645 (Steinmetz); Tr. 876 (Ruetsch); Abdun-Nabi Dep. 121-23.

[162]  This is particularly true as to Section 2.5, which, by its plain language, only gives IGEN the right to invoke the Field Monitor process or receive monetary compensation for Roche's inadvertent out-of-Field sales.  JTX 263 § 2.5 at ROCHE0055869.  Indeed, Wohlstadter explicitly recognized this fact in his July 16, 2003 memorandum to the JVOC.  *See* JTX 210 ¶ 6.

[163]  JTX 182 § 9.6 at MESO00009438.

License Agreement,[164] subject to an indication in § 9.6(iv) that the representations regarding consents or approvals, excluded any "consents attached hereto." As discussed below, Meso requested that change presumably to cover its consent. In any event, the representations in Section 9.6 underscore the importance to Roche of assuring that IGEN could grant Roche the rights in the Field that it sought.

Meso has offered no persuasive explanation why, if it was understood that Meso was a party to the License Agreement and was granting Roche a license, Roche sought additional representations and warranties from its obvious licensor, IGEN, but not from Meso. Meso's failure to provide such an explanation is of particular note because Meso unquestionably knew about the additional representations and warranties that Roche was seeking from IGEN and even went so far as to comment on them.[165] Because Meso was aware that Roche had concerns which it sought to ameliorate by obtaining additional representations and warranties from IGEN, it is unreasonable for Meso to have viewed

---

[164] JTX 263 § 9.6 at ROCHE0055877–78.

[165] JTX 182 § 9.6 at MESO00009438. The most significant comment made by Meso was its suggestion that the phrase "excluding any consents attached hereto" be added after the reference to "no consent, notice, approval, authorization, waiver or permit, to or from any person" in Section 9.6. *Id.* Meso's comment confirms that it was not a party to the License Agreement. First, Meso itself recognized the document it was signing was a "consent," not a joinder or a license grant. Also, Meso's comment reveals its position that so long as IGEN had Meso's consent, IGEN's representations and warranties in Section 9.6 were true. By giving IGEN and Roche its consent, Meso effectively agreed with IGEN's representations in Section 9.6.

itself as a party to, or licensor under, the License Agreement without having made similar representations and warranties to Roche.[166]

Therefore, considered as a whole, the parol evidence relating to the drafting history of the License Agreement and the attached consent support the conclusion that the parties did not intend the "join in" language in the consent to make Meso a party to, or licensor under, the License Agreement.

### E. The Events of July 2003 Also Support the Conclusion that Meso is Not a Party to the License Agreement

On July 9, 2003, the same day the Fourth Circuit Court of Appeals affirmed its right to terminate Roche's license, IGEN purported to terminate the 1992 License Agreement. According to Meso's interpretation of the 1995 License Agreement it had with IGEN, this termination activated its "springing rights," giving Meso an exclusive interest in all of the ECL technology that previously had been licensed to Roche. Yet, between July 9 and July 23, 2003, when the License Agreement was executed, no

---

[166] To the extent Meso argues that it did make those representations and warranties by "joining in" the licenses granted in the agreement, I find that argument unpersuasive. First, Section 9.6 clearly states that IGEN, not Meso, is making the representations and warranties. Second, in the Ongoing Litigation Agreement, discussed in more detail *infra*, Meso signed a joinder in which it agreed it would be treated "as though it were IGEN" for certain purposes. JTX 257 at MESO00042496. Meso made no such agreement as to the License Agreement. Finally, Section 9.6(iii) is substantively identical to the representation and warranty Meso made in the consent that it had not "licensed, assigned, or otherwise disposed of any rights that . . . would restrict or limit [Roche]'s exercise of the licenses granted in the License Agreement." JTX 263 at ROCHE0055887. Meso's representation in the consent would be entirely superfluous if it also had been deemed to have made all of the representations and warranties in Section 9.6.

significant modifications were made to that document. Equally significant, there is no evidence that any of Meso, IGEN, or Roche ever discussed the implications of the Fourth Circuit's decision on the License Agreement. Assuming Meso is correct that IGEN's purported termination of the 1992 License Agreement triggered its "springing rights" and gave it exclusive rights to all of the ECL technology that previously had been licensed to Roche in the 1992 License Agreement, the notion that the then-proposed agreement would not need to be amended or that Meso, as a purported party to, and licensor under, that agreement would not seek to engage in any sort of direct negotiations with Roche is puzzling, at best.

A week after the Fourth Circuit affirmed IGEN's right to terminate the 1992 License Agreement, and days before the new License Agreement was executed, Wohlstadter sent a memo to the JVOC demanding compensation for his cooperation in connection with the 2003 transaction. In that memo, Wohlstadter referred no fewer than seven times to the fact that *IGEN* was granting Roche a license, but the document never stated that Meso was granting Roche a license.[167] Moreover, Wohlstadter made no mention of Meso's "springing rights," or the significant increase in the scope of its rights that Meso apparently claims would have resulted from IGEN's termination of the 1992 License Agreement. If Wohlstadter believed that Meso was a party to the License Agreement and was granting Roche a license, he undoubtedly would have made that

---

[167] As discussed in Section I.B.6 *supra*, Wohlstadter himself also drew a distinction between "joining in" the licenses being granted to Roche and "becoming a party" to several other agreements.

59

point directly in his memo, which was designed to present as compelling a case as possible for compensation.

The fact that the memo was written to the JVOC, rather than Roche, also calls into question Meso's assertion that it granted Roche a license in connection with the 2003 transaction. Although Roche paid IGEN over $1 billion in connection with the 2003 transaction, it paid Meso nothing.[168] Despite allegedly having an exclusive interest in most, if not all, of the rights to the ECL technology that Roche was pursuing in the 2003 transaction and, thus, also having significant leverage over Roche, there is no evidence that Meso ever requested monetary compensation from Roche or that Roche ever offered Meso monetary compensation in exchange for its consents.[169] While Meso's actions

---

[168]  Meso argues that it received valuable nonmonetary compensation in the form of the Field restrictions for the license it allegedly granted Roche. The record, however, does not support that contention. The Field restrictions in the License Agreement were negotiated by IGEN, not Meso. Thus, I do not find credible Meso's assertion that it was willing to accept Field restrictions negotiated by IGEN primarily for IGEN's benefit as its sole form of compensation from Roche for granting it a license to all of Meso's ECL rights within the Field.

[169]  I note further that, although Meso argues it granted Roche a license under the License Agreement, there is a notable absence of evidence of direct communications between Meso and Roche. IGEN and Roche communicated directly with one another on a relatively frequent basis even outside of the direct negotiations of the transaction documents. *See, e.g.,* JTX 186, JTX 187, JTX 200. In one such exchange in June 2003, Humer expressed "concern" to Samuel Wohlstadter that because "some of the leading participants on your side are not only acting as representatives of IGEN, but also have an involvement in Meso, they may well be less enthusiastic to defend the interest of IGEN and its' [sic] shareholders, than keeping an eye on possible future developments with respect to Meso." JTX 186 at PA0000091. Humer asked that the elder Wohlstadter "help us all to minimize any misunderstandings as we approach the final rounds of negotiations." *Id.* Samuel Wohlstadter responded that "MSD representatives have

60

were inconsistent with those of a party to the License Agreement that had granted a license to Roche, they were entirely consistent with those of an entity whose primary source of leverage in the 2003 transaction was its ability to block a tax-favored transaction structure that would benefit IGEN's shareholders. Therefore, the key events that occurred shortly before the consummation of the 2003 transaction support the conclusion that IGEN, Roche, and Meso did not intend to make Meso a party to the License Agreement or to give it the enforcement rights of a licensor under the terms of that agreement through the "join in" language in the consent.

**F.     The Other Agreements Executed By Meso In Connection With the 2003 Transaction Support the Conclusion that Meso is Not a Party to the License Agreement**

As stated *supra*, in addition to the consent to the License Agreement, Meso also signed four other documents as part of the 2003 transaction: (1) the Global Consent and Agreement; (2) the Joinder to the Ongoing Litigation Agreement; (3) the Covenants Not to Sue; and (4) a July 24, 2003 letter agreement. The contents of each of these

---

participated at Roche's request in certain aspects of this transaction *to ensure that Roche obtains the consents that it desires*. At no time during these negotiations has any MSD representative controlled or influenced these negotiations in any manner adverse to IGEN or its shareholders." JTX 187 at CSM0031184 (emphasis added). This exchange is telling both for its substance (*i.e.,* IGEN's recognition that Meso is giving Roche consents, not a license) and for the absence of any evidence of a similar discussion occurring between Meso and Roche.

documents support the conclusion that Meso was not intended to be a party to the License Agreement.[170]

Meso signed the Global Consent and Agreement (the "Global Consent") as a party,[171] and designated an address at which it could receive communications related to that document.[172] Meso did neither of these things in relation to the License Agreement. Of greater significance, however, is that in communications regarding the drafting of the Global Consent, counsel for Meso, James McMillan, differentiated between the License Agreement and Meso's consent thereto. For example, in a July 19, 2003 draft of the Global Consent, McMillan proposed making "Consent to License Agreement" a defined term meaning "the Consent by [MSD] and [MST] attached to the License Agreement."[173] The final version of the Global Consent, for all intents and purposes, reflected McMillan's designation.[174] Equally important, McMillan defined the term "MSD Transaction Documents" with respect to MSD and MST as including the "Consent to

---

[170] These documents are relevant because "[u]nder New York law, all writings forming part of a single transaction are to be read together." *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998). *See also Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 197 (N.Y. 1941) (finding documents "executed at substantially the same time," and "related to the same subject-matter" "were contemporaneous writings" that "must be read together as one.").

[171] JTX 258 at MESO00042528.

[172] *Id.* § 5.02 at MESO00042521.

[173] JTX 224 at WH0062212 and WH0062217.

[174] *See* JTX 258 at MESO00042510 (stating "Consent to License Agreement" means "the Consent by MSD and MST to the License Agreement and attached thereto.").

License Agreement," but did not mention the License Agreement.[175] Nor does anything else in the Global Consent indicate that Meso became a party to the License Agreement or was, in any way, a licensor to Roche.[176]

As with the License Agreement, there are only two defined "Parties" in the Ongoing Litigation Agreement: IGEN and Roche.[177] In contrast to the License Agreement, however, the Ongoing Litigation Agreement states expressly that it "shall not become effective unless and until . . . [it is] joined by [MSD] and [MST] as evidenced by each of those companies signing the Joinder set forth on the signature page her[e]of."[178] Meso signed a page of the Ongoing Litigation Agreement that contains the following, bolded language: "JOINDER: Each of [MST] and [MSD] joins this Ongoing Litigation Agreement solely to confirm that it agrees to be bound by Section 3.3 and Article 8 of this Agreement as though it were IGEN for this purpose."[179]

---

[175] *Id.*; JTX 230 at CSM0037147, 0037153 (McMillan comments).

[176] The same can be said of the July 24, 2003 letter agreement. Like the Global Consent, Meso signed the letter agreement as a party. JTX 260 at ROCHE0056141. Also like the Global Consent, the letter agreement is devoid of any suggestion that Meso is a party to the License Agreement or is a licensor to Roche.

[177] JTX 257 at MESO00042482.

[178] *Id.* § 8.12 at MESO00042491.

[179] *Id.* at MESO00042496. Among other things, Article 8 contains the Ongoing Litigation Agreement's notice provision. In it, IGEN lists an address to which relevant communications should be sent. *Id.* § 8.3 at MESO00042489.

The document Meso signed in connection with the License Agreement was labeled "Consent by [MSD] and [MST]."[180] The Ongoing Litigation Agreement, however, shows that when those involved in the 2003 transaction wished to have a "non-Party" join and be bound by an agreement, they made that explicit. The "consent" signed by Meso in relation to the License Agreement did not specify explicitly that Meso would be bound by that agreement. In that sense, the consent differs materially from the "joinder" it signed in relation to the Ongoing Litigation Agreement. The consent's more general and less explicit reference to "joining in" fails to evidence any clear intent to have Meso become a party, in any way, to the License Agreement.[181]

As to the Covenants Not to Sue, that document specifically identifies Meso as a "Party."[182] This further demonstrates that when those participating in the 2003 transaction wished to make someone a party to an agreement, they made that designation

---

[180] JTX 263 at ROCHE0055887.

[181] I note that Meso cites the same Ongoing Litigation Agreement as evidence in support of its contrary argument that in "joining in" the licenses granted, it became a party to all of Article 2, and not just Sections 2.1 and 2.7. According to Meso, the Ongoing Litigation Agreement demonstrates that if the parties intended to confine Meso's status as a party narrowly to Sections 2.1 and 2.7 of the License Agreement, they would have made that explicit, as it was in the Ongoing Litigation Agreement. Although Meso's argument has some appeal, I consider it more telling that the participants in the 2003 transaction, including Meso, plainly knew how to use specific joinders to add "non-Parties" to agreements when they so intended. Yet, the "consent" attached to the License Agreement signed by Meso bears little resemblance to the "joinder" used in a contemporaneously executed related agreement.

[182] JTX 265 at MESO00042700.

64

clear.  Also unlike in the License Agreement, in the Covenants Not to Sue, Meso designated an address where it could receive relevant notices or communications.[183]  Of greatest relevance to this litigation, however, are two "Whereas" clauses in the beginning of the agreement.  The second of the Whereas clauses in the Covenants Not to Sue states, "WHEREAS, [IGEN and Roche] are parties to a License Agreement dated as of the date hereof [*i.e.*, July 24, 2003]," while the fourth such clause notes, "WHEREAS, Meso Scale, [*i.e.*, MSD and MST] are parties to one or more license agreements *between themselves and with* [*IGEN*] relating to ECL Core Technology."[184]  It is reasonable to infer that each of these "Whereas" clauses would have been worded differently if, Meso, in fact, had been intended to be a licensor to Roche under the License Agreement.

In sum, the content of the other documents Meso executed contemporaneously with the consent to the License Agreement support the conclusion that Meso was not a party to the License Agreement.  Those involved in the 2003 transaction clearly understood how to designate an entity as a party to any given agreement, just as they understood how to effectuate a non-party's joinder to an agreement.  The 2003 transaction documents demonstrate a consistent understanding that Meso executed a "joinder" to the Ongoing Litigation Agreement and a "consent" to the License Agreement.  If those participating in the 2003 transaction wished the "joinder" and the "consent" to have the same legal effect, I find that they would have used the same term in

---

[183]    *Id.* § 7.7 at MESO00042710.

[184]    *Id.* at MESO00042700 (emphasis added).

65

both instances instead of maintaining a consistent distinction between them. Meso did not adduce any meaningful evidence to the contrary. Therefore, I conclude that the documents other than the consent attached to the License Agreement executed by Meso in conjunction with the 2003 transaction provide additional evidence weighing in favor of finding that Roche and IGEN did not intend that the "join in" language in the consent would make Meso a party to the License Agreement as a whole or to the enforcement provisions of Article 2.

### G. Meso's Conduct After 2003 Supports the Conclusion that it is Not a Party to the License Agreement

Under New York law, the parties' course of performance under an agreement is given meaningful weight by a court attempting to determine the intent of the parties at the time the agreement was reached.[185] The evidence presented at trial supports the conclusion that, after the execution of the License Agreement in July 2003, Meso did not conduct itself as though it were a party to that agreement or a licensor to Roche.

Notwithstanding Wohlstadter's testimony that the Field restrictions in the License Agreement were of critical importance to Meso, Meso did not make any discernable

---

[185] *See Gulf Ins. Co. v. Transatlantic Reins. Co.*, 886 N.Y.S.2d 133, 143 (App. Div. 2009) ("How the parties perform a contract necessarily is manifested after execution of the contract, but their performance is highly probative of their state of mind at the time the contract was signed."); *Fed. Ins. Co. v. Americas Ins. Co.*, 691 N.Y.S.2d 508, 512 (App. Div. 1999) ("[T]he parties' course of performance under the contract is considered to be the most persuasive evidence of the agreed intention of the parties. Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.") (internal quotation marks and citations omitted).

effort to monitor Roche's compliance with those limitations after the License Agreement was finalized. Meso first learned of a potential issue involving Roche selling outside of the Field in June 2006, nearly three years after the License Agreement was executed, through BioVeris's public filings.[186] When Meso learned of this potential issue, it did not demand that Roche cease and desist its out-of-Field sales, nor did it conduct its own investigation. Instead, Meso "waited to see what was going to come out of" the BioVeris investigation because "the way that process worked under the [License Agreement], BioVeris was responsible for initiating the field monitor process and following through with this."[187]

If Meso believed it was a party to the License Agreement with the enforcement rights that it is asserting in this litigation, however, it is unclear why it would remain a passive bystander. Even if Meso thought it would be in its best interests to allow BioVeris to conduct the Field Monitor process on its own, at a minimum, it still could have been active in the process. For example, based on the purported critical importance of the Field restrictions to Meso, it could have requested regular updates on the status of the process from BioVeris. The evidence shows, however, that Meso did nothing to

---

[186]    Tr. 141 (Wohlstadter).

[187]    *Id.* at 141–42.

monitor either Roche's compliance with the License Agreement's Field restrictions or BioVeris's oversight of Roche's compliance.[188]

Meso also took no meaningful action to assert the rights it is claiming in this litigation in connection with the 2007 transaction between Roche and BioVeris. Wohlstadter testified that Meso did not attempt to enjoin or otherwise challenge that transaction because Keller of Roche told him that Roche would not negotiate with Meso until after its acquisition of BioVeris closed.[189] Meso's failure to act, however, undermines its current claim to have had contractual rights under the License Agreement to prevent Roche from intentionally operating outside the Field. If Meso believed that it had the rights it is asserting under the License Agreement, or any other agreement, and that such rights would be affected adversely by Roche's acquisition of BioVeris, one would have expected it to do more to enforce those rights than Meso did -- *i.e.*, waiting for the deal to close and enduring significant harm before taking any concrete action to attempt to resolve its dispute with Roche. Moreover, while Meso and Roche did negotiate with one another after the Roche-BioVeris transaction closed in June 2007, there is no evidence that Meso asserted any rights under the 2003 License Agreement during these negotiations. Wohlstadter admitted that he never explicitly mentioned the

---

[188]    In contrast, Meso's actions were consistent with the 2004 MSD appraisal process, in which neither MSD nor MST identified the License Agreement as a source of any of their rights. More broadly, Meso has failed to cite any record evidence in which it identified itself as a party to the 2003 License Agreement or as a licensor to Roche before the commencement of this litigation.

[189]    Tr. 152–53 (Wohlstadter).

2003 License Agreement as the source of the rights he was asserting in his negotiations with Roche.[190] This was confirmed by Christian Steinmetz, Roche's outside counsel, who testified that in negotiations between Roche and Meso, Wohlstadter tied the source of his rights "back to the IGEN/MSD 1995 license agreement."[191] Therefore, Meso's conduct after the License Agreement became effective also supports a finding that Meso was not a party to the License Agreement and has no rights to enforce its terms.

---

[190] Tr. 298–99 (Wohlstadter)

[191] Tr. 659-60 (Steinmetz). *See also* Tr. 924 (Ruetsch) ("Q: During your discussions after the 2007 transaction, did Jacob Wohlstadter ever suggest to you that the rights he was claiming were flowing from the 2003 agreement? A: No."). The documentary evidence, including the fourth draft settlement "agreement" circulated among Meso and Roche in April 2008, supports Steinmetz's and Ruetsch's testimony. JTX 555. *See also* JTX 527 (Aug. 2007 draft); JTX 539 (Sept. 2007 draft); JTX 543 (Oct. 2007 draft). According to the "Whereas" clauses of the April 2008 draft, Meso and Roche "desire[d] to enter into this Agreement to clarify their respective rights to the ECL technology and to continue the separation of the BioVeris' and MSD's businesses." JTX 555 at ROCHE0000325. One reason this clarification was necessary was because "MSD holds an exclusive license to [ECL] technology owned by BioVeris pursuant to that certain License Agreement, dated as of November 30, 1995 (as amended, the 'IGEN/MSD License Agreement'), by and between MSD and BioVeris (as successor to [IGEN])." *Id.* The only mention of the 2003 License Agreement in the April 2008 draft is that Meso "affirmed" the consents it had given previously in relation to a license limited to the Field. *Id.* § 6.3 at ROCHE0000329. Thus, it appears that, in its negotiations with Roche regarding conduct outside the Field, Meso was asserting its rights under the 1995 License Agreement with IGEN, and not rights under the 2003 License Agreement between IGEN and Roche.

**H.      Roche Has Presented the More Reasonable Interpretation of the "Join In" Language in the Consent[192]**

Because the "join in" language in the consent cannot reasonably be interpreted as making Meso a party to the License Agreement, the final remaining inquiry is determining what that language means based on the facts of this litigation. Having considered the testimony and evidence presented at trial, I conclude that the most reasonable interpretation of the phrase "join in the licenses granted" used in the Meso consent is that it was something more than a simple consent, but less than making Meso a party to the License Agreement or to Article 2 of that agreement. Specifically, I find that the phrase was included to emphasize Meso's consent to the license that IGEN was granting to Roche, both under the circumstances that existed at the time of the 2003

---

[192]   Meso also argued that any ambiguity in the meaning of the phrase "join in the licenses granted" should be construed against Roche under the doctrine of *contra proferentem*. As an initial matter, I do not consider it appropriate to apply the doctrine of *contra proferentem* to this dispute because the License Agreement and the consent both were negotiated heavily by sophisticated entities with the assistance of counsel. *See Sci. Applications Int'l Corp. v. State*, 876 N.Y.S.2d 182, 184 (App. Div. 2009) (rejecting application of *contra proferentem* where "[t]he record reflects that these are sophisticated parties and there is evidence that they engaged in negotiations as they worked out some of the details of the contract," and the "[c]laimant failed to establish that it had no voice in the selection of [the contractual] language.") (internal quotation marks and citations omitted). Regardless, the doctrine "is a rule of construction that should be employed only as a last resort." *Birdsong Estates Homeowners Ass'n, Inc. v. D.P.S. Sw. Corp.*, 957 N.Y.S.2d 785, 787 (App. Div. 2012). Because the parol evidence presented at trial establishes that Meso was not intended to be a party to the License Agreement and that Roche has asserted the more reasonable interpretation of the "join in" language, I find it unnecessary to utilize the doctrine here as a "last resort."

transaction and any changed circumstances that might result if Meso's "springing rights" were triggered in the future.

The record shows that Meso's undeniable, but ill-defined (from a practical perspective),[193] ECL-related rights were a concern to Roche as it attempted to negotiate a new license with IGEN. In having Meso "consent to and join in" the licenses that IGEN was granting to it, Roche neither sought nor received a grant of rights from Meso, but, rather, called special attention to and emphasized the fact that Meso agreed to accept Roche's use of the Licensed ECL Technology within the Field.[194] Roche considered this emphasis, or "calling out," significant in that it would make it that much more difficult for Meso to challenge successfully Roche's use of Licensed ECL Technology within the Field.[195] Because of the uncertainty surrounding Meso's rights, I conclude that Roche's

---

[193]    *See, e.g.,* JTX 62 at ROCHE0036626 (Roche December 2001 due diligence memorandum); JTX 207 at WH0009159 (Roche July 2003 due diligence memorandum). While these due diligence memoranda are persuasive evidence that Roche knew or believed that Meso had ECL-related rights, they were prepared as part of Roche's evaluation of acquiring IGEN, not of receiving a license from it. As a result, those documents have little probative value on the question of the meaning of the "join in" language.

[194]    *See* Tr. 603–04 (Steinmetz) ("Q: And when you included that phrase 'join in' into the consent, what meaning did you intend that phrase to have? A: I meant that phrase to refer to the two granting clauses in this final version of the license agreement. The purpose of the words were to have -- to call out the two important granting clauses, and to have MSD and MST say not just, it's ok, but we agree with what IGEN is doing in those granting clauses.").

[195]    Another example may be of assistance. Assume two parties have a contract containing an exclusive, mandatory forum selection clause in favor of Delaware. Assume further that the same contract also contains language forbidding either party from initiating a lawsuit related to the agreement in any non-Delaware court.

71

interpretation of the "join in" phrase does not render that phrase meaningless or superfluous. Rather, the language could prove valuable to Roche (and IGEN for that matter) in terms of helping them defend against a suit from Meso challenging some aspect of Roche's in-Field use of the Licensed ECL Technology or any inadvertent out-of-Field use by one of Roche's customers.

This emphasis also was particularly important to Roche because of Meso's "springing rights." Even assuming that Meso had no relevant in-Field ECL rights at the time of the 2003 transaction, an issue I need not and do not reach, Roche knew it was possible that Meso's "springing rights" could be triggered after the 2003 transaction, giving Meso exclusive rights in some or all of the ECL Technology that IGEN licensed to Roche under the License Agreement. Consequently, absent a consent or other agreement, Meso conceivably could be in a position at some point to challenge Roche's use of the ECL Technology, both inside and outside of the Field, notwithstanding the License Agreement. By having Meso "consent to and join in the licenses granted," Roche not only was asking Meso to consent to the License Agreement as it was, but also to acknowledge Roche's ability to continue to use the Licensed ECL Technology in the

Arguably the additional language proscribing litigation outside of Delaware is unnecessary because a lawsuit filed outside of Delaware would be a clear breach of the exclusive, mandatory forum selection clause, regardless of whether the additional language is present. That, however, does not make the additional language meaningless or superfluous. If one of the parties filed a lawsuit against the other outside of Delaware, the additional language could provide valuable additional support for the other party's argument that the non-Delaware suit should be dismissed or enjoined.

72

Field for the duration of the Agreement, even if its potential "springing rights" in Licensed ECL Technology later came to fruition. Thus, Roche was able to secure the protection it wanted from Meso's ability to challenge its use of the ECL Technology in the Field without actually receiving a grant of rights from Meso or making it a party to the License Agreement.

That does not mean, however, that Roche had free rein to use the Licensed ECL Technology as it saw fit. There is no evidence that, in connection with the 2003 License Agreement or otherwise, Meso ever consented to or "joined in" any authorization for Roche to operate outside of the Field, regardless of whether Roche had another license to do so. Therefore, to the extent Roche may have chosen to operate deliberately outside of the Field, it ran the risk that it may be infringing on Meso's intellectual property rights by practicing Meso's ECL technology without having either Meso's consent or an effective license to do so. Meso conceivably may have viable infringement or other claims against Roche for its actions since 2007, when it allegedly began operating deliberately outside of the Field. The question of whether Roche infringed on Meso's ECL-related intellectual property rights, however, is distinct from, and has no bearing on, the breach of contract claim that Meso pursued at trial in this litigation.

Applied to the terms of the License Agreement, Roche's interpretation of the clause in the consent attached to that agreement that Meso "consent[ed] to and join[ed] in the licenses granted to Roche in the License Agreement" also allows for a more logical reading of the agreement as a whole than Meso's interpretation. For example, as Meso itself notes, the license grant in Section 2.1 of the License Agreement is "subject to the

73

terms and conditions of" the agreement as a whole. If Meso is a party to Article 2, or even just Section 2.1, what other "terms and conditions" would it be subject to? It already has been determined definitively and preclusively that Meso is not a party to the agreement's arbitration provision. Meso has not offered any principled means of deciding which, if any, other parts of the License Agreement it would be subject to. Another example would be Section 14.11 of the License Agreement. Under that section, the "Parties," a term defined to include only IGEN and Roche, may receive any "benefit, right or remedy" under the License Agreement. If Meso were a party with enforcement rights as to that section based on having joined in Section 2.1, for example, Section 14.11 impermissibly would be rendered meaningless. Conversely, reading the License Agreement such that Meso is a party, but not subject to Section 14.11, would lead to a similarly incongruous result.[196]

---

[196] Another example of an anomalous outcome of finding Meso to be a party to some or all of the License Agreement is that, from an enforcement perspective, Meso would have more rights than IGEN or BioVeris had under the agreement. If before 2007 IGEN or BioVeris believed that Roche was selling ECL products outside of the Field deliberately and in breach of the License Agreement, under the plain language of Section 6.2(b), IGEN or BioVeris would have had to pursue any such "breach of contract" claim through arbitration. JTX 263 § 6.2 at ROCHE0055871–72. Because Meso already has been determined conclusively not to be a party to Section 6.2, if it could enforce the License Agreement as a party, it could do so, as it is seeking to do here, through litigation -- something that neither IGEN nor BioVeris could do. In essence, Meso contends that it was understood and agreed by Roche, IGEN, and Meso that, to the extent Meso could enforce the License Agreement, it could do so differently than IGEN or BioVeris could. But, Meso has cited no evidence or case law that supports that position.

Finally, I note that Roche and IGEN were careful to ensure that Meso did not undertake any obligations directly under the License Agreement itself. That is, to the extent Meso assumed any obligations to Roche or IGEN pertaining to the License Agreement, it did so only as part of its consent. This is evidenced by, among other things, the facts that: (1) Meso did not have a signature block next to those of Roche and IGEN at the end of the License Agreement and, instead, had its signature block beneath the attached consent; (2) Meso is not mentioned in any of the License Agreement's substantive provisions; (3) unlike its undertaking in the "joinder" to the Ongoing Litigation Agreement, Meso never agreed to be treated as if it were IGEN for any purpose under the License Agreement; and (4) Meso made certain representations and warranties in the consent that would be entirely superfluous and unnecessary if it effectively had subscribed to the representations and warranties of the licensor contained in the body of the License Agreement. Therefore, the holding in *Institut Pasteur v. Chiron Corp.*, upon which Meso relies, is inapposite to the facts of this litigation.[197]

---

[197] Even if I had concluded that Meso obtained some type of party status as a result of the "join in" language in the consent, I still would not be persuaded that Meso would have rights to enforce the License Agreement. Based on the lack of any discussion surrounding Meso's ability to enforce the License Agreement and the fact that Meso never specified the scope of the rights it purportedly was licensing to Roche, it appears that, at most, Meso granted Roche something analogous to a "quitclaim" license. Under such a license, Meso simply would have granted any rights in ECL Technology with respect to the Field that it had to Roche without making any representations as to what rights it actually had. *See, e.g., Fenn v. Yale Univ.*, 283 F. Supp. 2d 615, 638-39 (D. Conn. 2003). A quitclaim license, however, like a quitclaim deed, is essentially a unilateral grant of rights; it would not have given Meso enforcement rights under the License Agreement or otherwise.

In sum, construing "join in" in accordance with Roche's interpretation: (1) effectuates the intent of the parties, as established by the weight of evidence presented at trial; (2) gives meaning to both "consent to" and "join in;" (3) does not create any inconsistencies in the License Agreement or render any of its provisions meaningless; and (4) avoids giving undue weight to a few words in a consent that is attached to a heavily negotiated, complete agreement between Roche and IGEN. Therefore, I accept Roche's interpretation of the "join in" language contained in the consent, and, accordingly, I reject any interpretation of the "join in" language that either would make Meso a party to the License Agreement or endow Meso with any enforcement rights thereunder.

The trial in this dispute related solely to Count II of the Complaint, Meso's breach of contract claim. As such, all of the evidence presented at trial related to the issues of whether Roche breached Meso's rights under the 2003 License Agreement and, if so, to what extent Meso has been harmed by that alleged breach. Because I have concluded that Meso was not a party to the License Agreement and did not have any right to enforce the agreement, Meso has failed to prove the first element of its breach of contract claim. Therefore, I reject Count II of Meso's complaint on the merits and do not reach the issue of damages.

## III.    CONCLUSION

For the foregoing reasons, I conclude that neither MSD nor MST was a party to the 2003 License Agreement, and, thus, Meso has no right to enforce the 2003 License Agreement against Roche. Accordingly, Meso has failed to prove its breach of contract

76

claim, and I will enter judgment in favor of Defendants on Count II of the Complaint and dismiss that claim with prejudice. An appropriate Order and Final Judgment is being entered concurrently with this Memorandum Opinion.